**STATE v. TIRADO**

[358 N.C. 551 (2004)]

STATE OF NORTH CAROLINA v. FRANCISCO EDGAR TIRADO

STATE OF NORTH CAROLINA v. ERIC DEVON QUEEN

No. 5A01

(Filed 13 August 2004)

## 1. Criminal Law— joint trial—motion to sever

The trial court did not abuse its discretion in a first-degree murder, first-degree kidnapping, robbery with a dangerous weapon, conspiracy to commit first-degree murder, conspiracy to commit first-degree kidnapping, conspiracy to commit robbery with a dangerous weapon, attempted murder, and assault with a deadly weapon with intent to kill inflicting serious injury case by joining the trial of both defendants, because: (1) in regard to the argument that joinder prevented defendant from offering the portions of his redacted confession that implicated his codefendant, defendant's defense strategy focused on mitigation rather than on denying culpability, the full statement provided no exculpatory relief for defendant, convincing evidence of defendant's guilt was presented at trial including his own admissions and eyewitness testimony, and defendant's only expressed concern was that the jury would not be able to consider his full statement for mitigation purposes but defendant was allowed to present the entire statement to the sentencing jury in order for it to consider the full extent of defendant's cooperation with investigators; (2) even though defendant contends he conducted his defense differently based on his belief that he would not be able to introduce his statement implicating his codefendant, the record demonstrates that from the outset, all parties were aware that the statement existed and that it might be introduced in redacted form; and (3) even though defendants differed on their view of whether a particular juror should serve on the panel, defendant failed to put the court on notice that the difference was detrimental to him when he did not move to sever the trial at that time, the juror was eventually removed for cause, and a defendant is not entitled to a particular juror even after a jury has been empaneled.

## 2. Jury— peremptory challenges—*Batson* objection

The trial court in a prosecution for first-degree murder, first-degree kidnapping, robbery with a dangerous weapon and other offenses did not fail to adequately address whether the State's articulable reasons for exercising its peremptory challenges

against minorities were legitimate or a pretext because the factors, taken together, provided a wholly adequate basis for the court's determination that the prosecutor's facially race-neutral explanations for these peremptory challenges were race-neutral in fact including that: (1) one defendant was of mixed African-American and Hispanic descent, while the other defendant was African-American; (2) the two murder victims were white and the surviving kidnapping victim was African-American; (3) the State did not exhaust its peremptory challenges while selecting the first twelve jurors and four alternates; (4) the jury originally seated was racially diverse and so were the alternate jurors selected; and (5) the trial court also stated that it considered its own observations of each prospective juror and the various exchanges between the court, the prosecutor, and the prospective jurors.

**3. Jury— selection—use of panels—randomness—waiver of review**

Defendant waived review of the constitutionality of the trial court's use of panels for jury selection and the trial court's placement of a prospective juror into a particular panel where defendants raised no objection to the use of panels or the manner in which the trial court placed prospective jurors into panels. Moreover, defendants waived review as to whether the trial court's use of panels violated its duty under N.C.G.S. § 15A-1214(a) to ensure that jury selection was conducted in a random manner because defendants did not follow the statutorily mandated procedure for challenging the court's use of panels of jurors. Even if the statute was violated by the trial court's placement of a hearing impaired prospective juror into a particular panel, which is not determined, defendants showed no prejudice where defendants consented to the juror's excusal and neither defendant was forced to accept an undesirable juror.

**4. Jury— excusal of prospective juror—qualifications**

The trial court did not err in a prosecution for first-degree murder and other offenses by excusing a prospective juror based on the fact that she was not qualified under N.C.G.S. § 15A-1211(b), because: (1) defendants waived this issue by failing to object at trial; and (2) in any event, the prospective juror was properly excused based on the fact that she was no longer a resident of the pertinent county.

**5. Kidnapping— instructions—purpose not alleged in indictment—absence of prejudice**

Although the trial court erred by instructing the jury as to particular purposes for the kidnapping of two victims that had not been specified in the indictments and by instructing on the purpose set out in the indictment for the kidnapping of a third victim along with an additional purpose that had not been alleged in the indictment, this error was not prejudicial because (1) the indictments for the first two victims charged the purpose of "facilitating the commission of a felony," and the trial court's instructions placed a higher burden on the State by limiting the underlying felonies that the jury could find to support the kidnapping charge; and (2) the evidence as to the third victim supported both the purpose set out in the indictment and the additional purpose set out in the trial court's instructions so that a different result would not have been reached had the trial court instructed only on the purpose charged in the indictment.

**6. Criminal Law— multiple conspiracies—sufficiency of evidence**

The trial court did not err by entering judgments against defendants based on multiple convictions of conspiracy for first-degree murder, first-degree kidnapping, and robbery with a dangerous weapon even though defendants contend the State's evidence was insufficient to prove the existence of more than a single conspiracy, because: (1) a rational juror, considering the series of meetings, the variety of locations and participants, the different objectives, and the statements of conspirators, could readily find the evidence established multiple separate conspiracies rather than one single conspiracy; and (2) neither defendant objected to the conspiracy charges submitted to the jury.

**7. Constitutional Law— double jeopardy—submission of attempted first-degree murder and assault with deadly weapon inflicting serious injury**

The trial court did not violate defendants' double jeopardy rights by submitting to the jury both attempted first-degree murder and assault with a deadly weapon with intent to kill inflicting serious injury, and by imposing consecutive sentences for these offenses, because: (1) assault with a deadly weapon with intent to kill inflicting serious injury requires proof of the use of a deadly weapon as well as proof of serious injury, neither of which

are elements of attempted first-degree murder; and (2) attempted first-degree murder includes premeditation and deliberation, which are not elements of assault with a deadly weapon with intent to kill inflicting serious injury.

**8. Criminal Law— prosecutor's argument—codefendant's post-arrest statements corroborated eyewitness—right of confrontation**

Defendant's right of confrontation was not denied when one of the prosecutors stated during closing arguments that a nontestifying codefendant's post-arrest statements corroborated the testimony of an eyewitness regarding the events of 16-17 August 1998, because: (1) the statements were redacted to delete all references to the defendant; (2) the trial court gave the jury limiting instructions that the statements could only be considered as evidence against the codefendant who made the statements and not against the defendant; (3) the prosecutor made a statement reminding the jury of the defined purpose for which the evidence had been admitted; and (4) any error was harmless beyond a reasonable doubt when substantial physical and testimonial evidence independent of the codefendant's statements corroborated the eyewitness's testimony against the defendant.

**9. Aiding and Abetting— acting in concert—motion to dismiss—sufficiency of evidence—constructive presence**

The trial court did not err by denying defendant's motion to dismiss the charges for the substantive offenses of attempted first-degree murder, assault with a deadly weapon with intent to kill inflicting serious injury, kidnapping, and robbery with a dangerous weapon committed against one of the victims based on the theory of aiding and abetting or acting in concert even though defendant contends that he was not physically present for these crimes, because: (1) the State presented sufficient evidence to allow a rational juror to conclude that defendant joined with one or more persons in the purpose to kidnap, rob, assault with a deadly weapon, and attempt to murder the victim; and (2) defendant was constructively present when these crimes were carried out.

**10. Sentencing— capital—bifurcated proceedings—individual jury poll—intervening evidence—prejudicial error**

One defendant is entitled to a new capital sentencing proceeding because the trial court failed to follow the mandate of

N.C.G.S. § 15A-2000(b) that jurors be individually polled upon delivery of the sentence recommendation by the jury foreman where the trial court bifurcated the sentencing proceedings so that a codefendant's unredacted statement could be read to the jury without prejudicing defendant; defendant's capital sentencing proceeding was held first; the trial court deferred the poll of the individual jurors in defendant's case until after the codefendant's sentencing proceeding was completed; and the statutorily mandated poll of the individual jurors in defendant's sentencing proceeding did not occur until after the jury heard additional inculpatory evidence in the codefendant's sentencing proceeding that the trial court had ruled inadmissible as to defendant.

**11. Jury— dismissal of juror during trial—pending charges against juror—abuse of discretion standard**

The trial court did not abuse its discretion in a prosecution for first-degree murder, first-degree kidnapping, robbery with a dangerous weapon and other offenses by dismissing a juror during the trial and substituting an alternate, because: (1) the court and trial counsel were notified that the juror was under investigation for embezzlement; (2) the trial court properly exercised its discretion to discharge the juror prior to deliberations when the court was informed that felony warrants were pending against the juror; and (3) the trial court took pains to ensure that the right to a fair trial for both defendants was protected.

**12. Discovery— failure to provide false exculpatory statement—failure to show prejudice**

The trial court did not abuse its discretion by denying defendant's motion for a mistrial based on the prosecutor's failure to provide essential discovery as required by N.C.G.S. § 15A-903 including defendant's false exculpatory statement to investigators to the effect that he had not participated in the kidnapping of two of the victims, because: (1) although the statement is relevant to defendant's strategy of focusing on his cooperation in order to win mitigation in the capital case, defendant failed to show any prejudice resulting from the nondisclosure; (2) defendant received pretrial notice that he had incorrectly told investigators at an earlier time on the same date that he was not present when the two victims were kidnapped; and (3) the statement had no effect on the outcome of defendant's trial.

**13. Constitutional Law— double jeopardy—first-degree murder—first-degree kidnapping—victims seriously injured**

The trial court did not violate defendant's double jeopardy rights by convicting defendant for first-degree murders and also for first-degree kidnapping based on a finding that two of the victims were seriously injured, and also for the crimes of both assault with a deadly weapon with intent to kill inflicting serious jury and first-degree kidnapping when another victim was also seriously injured, because: (1) defendant failed to preserve this issue for appellate review since he did not object at trial to the submission of first-degree kidnapping or to the instructions on that offense; and (2) even if the issue had been preserved, double jeopardy does not apply here when each crime charged contains an element not required to be proved in the other.

**14. Appeal and Error— preservation of issues—failure to object at trial on constitutional grounds**

Although defendant contends his constitutional right to individualized sentencing in a capital first-degree murder case was violated when the trial court allowed the same jury to consider sentences for defendant and his codefendant at separate sentencing proceedings, this assignment of error is dismissed because: (1) defendant waived this issue by failing to object at trial on these constitutional grounds; and (2) even if this issue was preserved, the trial court took care to ensure that the jury gave individualized consideration to defendant's argument that he should be spared the death penalty by instructing the jury not to consider against defendant any evidence presented in the codefendant's prior sentencing hearing, and jurors are presumed to follow the trial court's instructions.

**15. Sentencing— capital—bifurcated proceedings—jury's knowledge of codefendant's sentence**

The principle that a codefendant's sentence is irrelevant in a capital sentencing determination was not violated in defendant's sentencing proceeding when his codefendant was sentenced first in a separate proceeding by the same jury and the jury knew what the sentence was, because: (1) the trial court explicitly instructed the jury that it could not consider anything presented in the codefendant's sentencing hearing against defendant and required the jury to consider separately the evidence as to any aggravating and mitigating circumstances

for each defendant; and (2) the record reflected that the trial court properly severed the sentencing hearings of the two defendants for the specific purpose of protecting the right of each to individualized sentencing.

**16. Indigent Defendants— capital trial—right to two counsel**

An indigent defendant's statutory right to the assistance of two attorneys was not violated when one of his attorneys was absent during a portion of his codefendant's sentencing hearing, because: (1) N.C.G.S. § 7A-450(b1) does not require, either expressly or impliedly, that both of a capital defendant's attorneys be present at all times for all matters; (2) the trial court properly complied with the statute by appointing two counsel to represent defendant months before the trial began; and (3) defendant consented to his counsel's absence for a previously scheduled vacation when the other attorney remained.

**17. Sentencing— aggravating circumstances—murder especially heinous, atrocious, or cruel**

The trial court did not err in a capital sentencing proceeding by submitting to the jury under the pattern jury instructions the N.C.G.S. § 15A-2000(e)(9) aggravating circumstance that the murders were especially heinous, atrocious, or cruel, because: (1) the evidence showed that the murder victims endured a prolonged dehumanizing ordeal; (2) the murder victims were unquestionably aware of but helpless to prevent impending death; and (3) the killings of the victims demonstrated an unusual depravity of mind on the part of defendant.

**18. Constitutional Law— right to fair sentencing hearing—cruel and unusual punishment—required presence at codefendant's sentencing hearing**

The trial court did not deny defendant a fair sentencing hearing and freedom from cruel and unusual punishment by requiring him to be present during his codefendant's sentencing hearing, because: (1) defendant waived appellate review of this issue by failing to object to the trial court's ruling that he had to attend his codefendant's sentencing hearing; and (2) the trial court acted out of an abundance of caution and with the purpose of avoiding any claim of error arising from defendant's absence.

**19. Sentencing— aggravating circumstances—murder committed during commission of kidnapping—murder committed for pecuniary gain—murder part of course of conduct**

The trial court did not commit plain error in a capital sentencing proceeding by submitting as separate aggravating circumstances under N.C.G.S. § 15A-2000(e)(5) that the murders were committed while defendant was engaged in the commission of kidnapping, under N.C.G.S. § 15A-2000(e)(6) that the murders were committed for pecuniary gain, and under N.C.G.S. § 15A-2000(e)(11) that the murders were part of a course of conduct, because: (1) the (e)(5) circumstance directs the jury's attention to the factual circumstances of defendant's crimes, thus addressing defendant's conduct, and evidence supporting this circumstance was the hijacking of one victim's car; (2) the (e)(6) circumstance requires the jury to consider not defendant's actions but his motive for killing the victims, and the evidence supporting this circumstance was the robbery of the victims; and (3) it is proper for a sentencing jury in a double homicide case to find each murder to be a course of violent conduct aggravating the other murder, thus providing the basis for the (e)(11) circumstance.

**20. Sentencing— death penalty—proportionate**

The trial court did not err by sentencing defendant to the death penalty for two first-degree murders, because: (1) the jury found defendant guilty of premeditation and deliberation and under the felony murder rule; (2) no death sentence involving multiple homicides has been determined to be disproportionate; and (3) our Supreme Court has never found a sentence of death to be disproportionate where more than two aggravating circumstances were found.

Justice BRADY did not participate in the consideration or decision of this case.

Appeal as of right pursuant to N.C.G.S. § 7A-27(a) from judgments imposing two sentences of death for each defendant entered by Judge William C. Gore, Jr., on 11 April 2000 in Superior Court, Cumberland County, upon jury verdicts finding each defendant guilty of two counts of first-degree murder. On 31 January 2002, the Supreme Court allowed defendants' motions to bypass the Court of Appeals as to their appeal of additional judgments. Heard in the Supreme Court 3 February 2003.

*Roy Cooper, Attorney General, by G. Patrick Murphy, Special Deputy Attorney General, and Mary D. Winstead, Assistant Attorney General, for the State.*

*Glover & Petersen, P.A., by Ann B. Petersen, for defendant-appellant Tirado.*

*Rudolf Maher Widenhouse & Fialko, by M. Gordon Widenhouse, Jr., for defendant-appellant Queen.*

EDMUNDS, Justice.

Defendants Francisco Edgar Tirado and Eric Devon Queen were indicted on 4 January 1999. In 98 CRS 34831, Tirado was charged with two counts of first-degree murder, two counts of first-degree kidnapping, two counts of robbery with a dangerous weapon, one count of conspiracy to commit first-degree murder, one count of conspiracy to commit first-degree kidnapping, and one count of conspiracy to commit robbery with a dangerous weapon, all involving alleged offenses against victims Susan Moore and Tracy Lambert on 17 August 1998. In 98 CRS 34836, Queen was similarly charged with the same offenses against the same victims. Additional indictments were returned on 25 January 1999. In 98 CRS 35037, Tirado was charged with attempted first-degree murder, conspiracy to commit first-degree murder, assault with a deadly weapon with intent to kill inflicting serious injury, first-degree kidnapping, and robbery with a dangerous weapon for crimes committed against Debra Cheeseborough on 17 August 1998. In 98 CRS 35028, Queen was charged with the same offenses against the same victim.

On 17 December 1999, the trial court granted the State's motions both to join offenses as to each defendant and to join defendants' cases for trial. Defendants were tried capitally before a jury at the 7 February 2000 Criminal Session of Superior Court, Cumberland County. On 3 April 2000, the jury found defendants guilty on all fourteen of the submitted charges. The verdicts of first-degree murder as to each victim were based both on premeditation and deliberation and on felony murder.

The trial court ordered separate sentencing proceedings for defendants. At the conclusion of Tirado's capital sentencing proceeding, the trial court ordered the verdict sealed until Queen's capital sentencing proceeding was complete. The jury recommended that Tirado and Queen be sentenced to death for the murders of Susan Moore and Tracy Lambert, and the trial court entered judgments

accordingly. The trial court also sentenced defendants to consecutive terms for the other twelve felony convictions.

Evidence presented at trial established that defendants were two of nine members of the Crips gang who undertook a number of "missions," or criminal acts, during the night of 16-17 August 1998, in Fayetteville, North Carolina. In addition to defendants Tirado and Queen, the gang members included gang leader or "queen" Christina Walters, Ione Black, Tameika Douglas, Carlos Frink, John Juarbe, Carlos Nevills, and Darryl Tucker. These individuals belonged to different "sets," or subgroups, of the Crips gang.

On 16 August 1998, the gang members gathered at Walters' residence, a trailer located at 1386 Davis Street. Ione Black, who had been a member of another gang, was initiated into the Crips by means of a ceremony involving being beaten by the others. Thereafter, the gang members undertook preparations for the evening's missions. Walters, Douglas, and an unidentified male drove to the local Wal-Mart to steal toiletries and clothing and to purchase cartridges. The unidentified male returned alone to the trailer with a box of cartridges. Using fingernail polish from Walters' bedroom, Tirado painted the tips of the bullets blue, the color identified with the Crips gang. Meanwhile, Queen directed Black and Nevills to return to Wal-Mart and retrieve Walters and Douglas.

After the group returned from Wal-Mart, Walters assigned a mission to Douglas, Black, and Nevills, directing them to find a victim to rob, steal the victim's car, put the victim in the trunk of the car, then return to Walters' residence within an hour and a half. After providing Nevills with a gun, Walters and the unidentified male drove away. Douglas, Black, and Nevills walked around looking for a car to steal, and at about 12:30 a.m., they spotted Debra Cheeseborough closing and locking the door to the Bojangles restaurant where she worked as manager. They abducted Cheeseborough at gunpoint and forced her into the back seat of her car.

On the way back to Walters' residence, the gang members robbed Cheeseborough of her jewelry and money, and then remembering their instructions, stopped and forced her into the trunk. When they reached Walters' trailer, everyone gathered around the car, arguing over who would shoot Cheeseborough. Although Tirado stated, "I'll shoot the bitch," Queen, Walters, Douglas, and Frink drove away in Cheeseborough's car. The rest of the gang remained at Walters'

trailer, where Tirado mumbled several times, "Damn, they should have let me go."

Queen drove Cheeseborough's car to Smith Lake, a location on the Fort Bragg military base. Cheeseborough was removed from the trunk, and Douglas took from Cheeseborough a cross that she was wearing. Walters then pointed a handgun at her and pulled the trigger. When the pistol jammed, Walters recocked it and fired a bullet into Cheeseborough's right side, knocking her to the ground on her stomach. As she lay there, she heard a male say, "Hit her in the head." Walters fired another shot that passed through Cheeseborough's glasses, grazed her eyelid, and hit her in the thumb. Walters fired additional shots into Cheeseborough's back, side, right leg, and chest. Cheeseborough feigned death and the four gang members drove away. The next morning, a passerby found Cheeseborough. She was taken to a hospital and treated for multiple gunshot wounds.

After the group left Cheeseborough for dead, they returned to Walters' trailer, where the rest of the gang remained congregated. Upon realizing that they needed a second car to accommodate everyone, Queen, accompanied by Walters, Frink, Black, Douglas, and Tucker, drove Cheeseborough's car to find another vehicle. They eventually targeted a 1989 Pontiac Grand Prix driven by Susan Moore and in which Tracy Lambert was a passenger. After following the Grand Prix for some distance, Queen was able to trap it at the end of a dead-end road. Walters handed a gun to Tucker and someone in the car told him to "go ahead." Queen, Walters, and Frink then drove away in Cheeseborough's car after Queen directed Black, Douglas, and Tucker to be back at Walters' trailer in forty-five minutes.

Douglas and Tucker forced Moore and Lambert into Moore's trunk at gunpoint, and then Black, Douglas, and Tucker drove Moore's car to Walters' trailer. At one point during the drive, Tucker stopped the car so that Black and Douglas could open the trunk and rob Moore and Lambert of their jewelry.

Upon this group's arrival at Walters' trailer, the entire gang surrounded the car. While the gang divided Moore's and Lambert's money and jewelry and burned their purses and identification, they discussed who would kill the women. On instructions from Walters, the gang members then drove Cheeseborough's and Moore's cars to a location in Linden. Moore and Lambert were forced out of the trunk of the Grand Prix. Both were pleading for mercy. Queen told Lambert to shut up, then shot her in the head. As Lambert fell, Queen walked

back to the car and stood next to Tirado. When Tirado held a large knife to Moore's throat, Moore begged him not to cut her and to shoot her instead. In response, Tirado shot Moore in the back of the head. Both Lambert and Moore died of their wounds.

The gang members returned to Walters' trailer in Cheeseborough's and Moore's cars, and then split up. Seven members of the gang, including Tirado and Queen, fled to Myrtle Beach. On Tuesday, 18 August 1998, Myrtle Beach police officers apprehended Juarbe and Tucker in Moore's car. The next day, Myrtle Beach police officers arrested defendants Tirado and Queen, along with Walters, Frink, and Douglas, in a motel room rented by Walters.

Additional evidence will be discussed below as necessary to address specific issues. Because both Tirado and Queen present several similar assignments of error, we will first address those arguments together. We will then consider each defendant's individual assignments of error.

## PRE-TRIAL ISSUES

[1] Defendants Tirado and Queen both contend that the trial court erred when it allowed their cases to be joined for trial. Defendants claim that the joinder deprived them of their state and federal constitutional rights to due process of law.

Each defendant was charged in two multi-count indictments. On 29 September 1999, the State filed pretrial motions both to join the offenses against each defendant and to join for trial the cases of defendants so that all charges against both defendants would be resolved in a single trial. At a hearing on the motions, the State argued that both defendants were accountable for each of the offenses enumerated in the indictments and that these offenses were part of a common scheme or plan, that individual activities of defendants were part of the same act or transaction, and that the offenses were closely connected in time, place, and occasion. The prosecutor also acknowledged that:

> As it relates to a joint trial, Mr. Queen made a statement which implicated himself as a killer of one of the young ladies and implicated Mr. Tirado as a killer of the other young lady.

> We realize that, in a joint trial, we would not be able to offer the aspect of Mr. Queen's statement/confession implicating Mr.

Tirado. And we are aware of that, and we plan to deal with that if it becomes an eventuality.

Defendants objected to joinder and argued that the State should present evidence from which the court could make findings of fact. Tirado also objected on the grounds of "potential Bruton problems." *See Bruton v. United States*, 391 U.S. 123, 20 L. Ed. 2d 476 (1968) (holding that at a joint trial, admission of a statement by a nontestifying co-defendant incriminating the other defendant violated that defendant's Sixth Amendment rights under the Confrontation Clause). The hearing judge, relying on the State's representations of the nature of the cases, allowed joinder of offenses as to each defendant and joinder of defendants for trial, subject to the trial judge's satisfaction that Queen's statements could be redacted to omit references to Tirado.

Tirado again raised the issue of joinder at the completion of jury selection on 23 February 2000, when he moved to sever his trial from Queen's. Tirado also filed a motion *in limine* requesting redaction of Queen's out-of-court statement pursuant to *Bruton v. United States*. *See id.* Queen objected to the admission of a redacted statement, arguing that he was relying on the jury finding mitigating value in his willingness to admit his wrongdoing. Queen's position was that if a redacted statement was admitted, the jury would not be able to consider his entire statement for mitigation purposes and that it would appear he had not been fully candid with the investigators. The trial court denied the motion to sever and ordered that a redacted version of Queen's statement would be admissible in the guilt-innocence phase of trial. When both defendants were found guilty during that phase, the trial court severed the sentencing hearings and admitted Queen's unredacted statement during his sentencing hearing.

North Carolina General Statutes provide for joinder of defendants subject to the following provisions:

(b) Separate Pleadings for Each Defendant and Joinder of Defendants for Trial.

(1) Each defendant must be charged in a separate pleading.

(2) Upon written motion of the prosecutor, charges against two or more defendants may be joined for trial:

    a. When each of the defendants is charged with accountability for each offense; or

    b. When, even if all of the defendants are not charged with accountability for each offense, the several offenses charged:

        1. Were part of a common scheme or plan; or

        2. Were part of the same act or transaction; or

        3. Were so closely connected in time, place, and occasion that it would be difficult to separate proof of one charge from proof of the others.

N.C.G.S. § 15A-926(b) (2003).

In addition, North Carolina General Statute § 15A-927(c), dealing with multi-defendant cases, provides that the court

    (2) . . . must deny a joinder for trial or grant a severance of defendants whenever:

    a. If before trial, it is found necessary to protect a defendant's right to a speedy trial, or it is found necessary to promote a fair determination of the guilt or innocence of one or more defendants; or

    b. If during trial, upon motion of the defendant whose trial is to be severed, or motion of the prosecutor with the consent of the defendant whose trial is to be severed, it is found necessary to achieve a fair determination of the guilt or innocence of that defendant.

N.C.G.S. § 15A-927(c)(2) (2003).

Public policy supports consolidation of trials where defendants are alleged to be responsible for the same behavior. *State v. Nelson,* 298 N.C. 573, 586, 260 S.E.2d 629, 639 (1979), *cert. denied,* 446 U.S. 929, 64 L. Ed. 2d 282 (1980). A trial court's ruling on a motion for joinder is reviewed for abuse of discretion in light of the circumstances of the case, and the ruling will not be disturbed on appeal absent a showing that the joinder caused the defendant to be deprived of a fair trial. *State v. Golphin,* 352 N.C. 364, 399, 533 S.E.2d 168, 195 (2000), *cert. denied,* 532 U.S. 931, 149 L. Ed. 2d 305 (2001).

Queen first argues that joinder prevented him from offering the portions of his redacted confession that implicated his co-defendant,

Tirado. Queen argues that the trial court's redacting the statement to avoid prejudice to Tirado caused prejudice to him by making him appear less than candid with law enforcement officers. Specifically, Queen contends that all the other evidence indicated that both he and Tirado participated in the crimes, and that the absence of any reference to Tirado in Queen's statement was obvious to the jury and suggested that he was not completely honest with the investigators when he confessed.

We have held that when joinder interferes with a defendant's opportunity to use a confession to his advantage because the defendants have antagonistic defenses, the trial court should grant severance. *See State v. Boykin*, 307 N.C. 87, 90-92, 296 S.E.2d 258, 260-61 (1982) (where defendant was unable to explain that he gave false statements to protect his co-defendant brother); *State v. Alford*, 289 N.C. 372, 385-89, 222 S.E.2d 222, 231-33 (where defendant was unable to use confession of co-defendant more fully to support his alibi), *judgment vacated in part on other grounds by Carter v. North Carolina*, 429 U.S. 809, 50 L. Ed. 2d 69 (1976). However, when the deletions do not result in a "severely censored statement[] going to the heart of the accused's defense," this Court has held that the trial court's denial of severance is not so arbitrary that it could not have been the result of a reasoned decision. *State v. Barnes*, 345 N.C. 184, 223, 481 S.E.2d 44, 65, *cert. denied*, 522 U.S. 876, 139 L. Ed. 2d 134 (1997), *and cert. denied*, 523 U.S. 1024, 140 L. Ed. 2d 473 (1998).

Our review of the redacted and the unredacted versions of Queen's statement reveals that the only difference between the two is that the latter contains no mention of Tirado. As in *State v. Barnes*, Queen's redacted statement does not rise to the level of a severely censored statement that goes to the heart of his defense. Even accepting Queen's argument that the redacted statement made him appear less than forthright to law enforcement, his strategy focused on mitigation, not on denying his culpability. Convincing evidence of Queen's guilt was presented at trial, including his own admissions and the eyewitness testimony of Ione Black. Queen's full statement inculpating Tirado provided no exculpatory relief for Queen. Therefore, Queen's defense was not jeopardized by the admission of his redacted statement during the guilt-innocence phase of the trial. Moreover, Queen was allowed to present the entire statement to the sentencing jury after the trial court instructed that the original statement had been redacted by the court to delete references to Tirado as required by law and that the jury should harbor no resentment

**STATE v. TIRADO**

[358 N.C. 551 (2004)]

toward Queen. As a result, the jury at sentencing was able to consider the full extent of Queen's cooperation with investigators.

Second, Queen maintains that he was prejudiced because he believed that, as a result of his case being joined with Tirado's for trial, his statement would not be introduced because it implicated Tirado. Queen claims that, as a result, he followed a trial strategy of denying guilt and that had he known the statement would be introduced, he would have defended the case differently. However, the record demonstrates that from the outset, all parties were aware that the statement existed and that it might be introduced in redacted form. As noted above, at the 15 December 1999 hearing on the State's joinder motion, the district attorney pointed out that "we would not be able to offer the aspect of Mr. Queen's statement/confession implicating Mr. Tirado." Queen made no motion to suppress his statement, and when a witness was called to introduce the statement at trial, his counsel stated:

> We have known for some time it was going to be an issue. I believe when we talked about redacting the statement and the question or the ultimate hearing was reserved for the time of trial—the court may recall that I made a statement at that time that there is a problem with not letting in the statement in its totality so the jury may consider every inference and nuance from that particular statement.

Thus, Queen's only expressed concern was that the jury would not be able to consider his full statement for mitigation purposes. Under these circumstances, we fail to see how he was unfairly prejudiced in conducting his defense.

Finally, Queen argues that he was prejudiced when he and co-defendant Tirado differed as to whether juror Lucier should be dismissed by the court. As is detailed later in this opinion, the district attorney received information during the trial that this juror was under criminal investigation. Although both defendants initially opposed excusing juror Lucier, Tirado later apparently changed his mind and asked that juror Lucier be removed. Queen argues that he was therefore at odds with his co-defendant. However, if Queen believed that Tirado's change in position as to the dismissal of juror Lucier was detrimental to him, he could have put the court on notice by moving then to sever. The court eventually removed the juror for cause. A trial court has the authority under N.C.G.S. § 15A-2000(a)(2) to excuse a disqualified juror before the sentencing proceeding

begins and the court's decision is reviewed for abuse of discretion. *State v. Nobles*, 350 N.C. 483, 513, 515 S.E.2d 885, 903 (1999). Although Queen also argues that he "was entitled to his selected jurors," a defendant is not entitled to a particular juror, even after a jury has been empaneled. *State v. Nelson*, 298 N.C. at 593, 260 S.E.2d at 644. We see no abuse in the judge's decision here, nor do we perceive that either defendant was unfairly prejudiced.

Tirado argues that if the joinder was improper as to Queen, it was similarly improper as to him. Because we have determined that Queen was not prejudiced by joinder, Tirado also was not prejudiced.

These assignments of error are overruled.

## JURY SELECTION ISSUES

[2] Tirado and Queen contend that the trial court erred by allowing the State to exercise peremptory challenges in a racially discriminatory manner in violation of their state and federal constitutional rights. Specifically, defendants contend that the State's reasons for excusing prospective jurors Amilcar Picart and Regina London were pretextual and that the trial court failed to conduct an adequate inquiry of the reasons these prospective jurors were excused.

"The Equal Protection Clause of the Fourteenth Amendment to the United States Constitution and Article I, Section 26 of the North Carolina Constitution prohibit a prosecutor from peremptorily excusing a prospective juror solely on the basis of his or her race." *Batson v. Kentucky*, 476 U.S. 79, 86, 90 L. Ed. 2d 69, 80 (1986); *State v. White*, 349 N.C. 535, 547, 508 S.E.2d 253, 262 (1998), *cert. denied*, 527 U.S. 1026, 144 L. Ed. 2d 779 (1999). "In *Batson* the United States Supreme Court set out a three-pronged test to determine whether a prosecutor impermissibly excluded prospective jurors on the basis of their race." *State v. Bonnett*, 348 N.C. 417, 433, 502 S.E.2d 563, 574 (1998), *cert. denied*, 525 U.S. 1124, 142 L. Ed. 2d 907 (1999). First, a defendant must establish a *prima facie* case that the peremptory challenge was exercised on the basis of race. *State v. Williams*, 355 N.C. 501, 550, 565 S.E.2d 609, 638 (2002), *cert. denied*, 537 U.S. 1125, 154 L. Ed. 2d 808 (2003). Second, if such a showing is made, the burden shifts to the prosecutor to articulate a race-neutral explanation for striking the jurors in question. *Id.* Third, the trial court must then determine whether the defendant has proven purposeful discrimination. *Id.*

In the case at bar, defendants raised their *Batson* objections during jury selection after the State exercised its second group of five

peremptory challenges. At the time defendants objected, the State had peremptorily challenged two white, two Hispanic, and six African-American prospective jurors and had accepted two African-American and four white prospective jurors. Based upon a review of these challenges, the trial court found that defendants had made a *prima facie* showing of discrimination and required the State to offer explanations for peremptory challenges six through ten. The prosecutor provided the following reasons for its peremptory challenge of prospective juror Amilcar Picart, a Latino male:

> As to Mr. Picart, we have notes that we've made as to the manner in which he conducted himself. We were observant of his body language. We observed it on several occasions when we would ask questions, he would not maintain eye contact with us. He would then—on other occasions, he'd look at us and look down and look away to the left and try to avoid eye contact on many occasions with us. In addition to that, I tried to draw him out on some of his answers and I could not get him to give us more than a few words answer.
>
> Based on that total lack of participation as far as the answers go and the fact that he would not—we could not—we had lack of eye contact with him, number one, and when we did have it, he was quick to look away and look down to the left and then, in addition to that, we observed him on what we believe to be several occasions making or attempting to make eye contact either with one of the defendants or looking for long periods of time in that particular defendant's direction. Those are the considerations we had with him.

With respect to prospective juror Regina London, an African-American female, the prosecutor provided the following explanation for its peremptory challenge:

> As to Ms. London, one of our big concerns with her was that early on when Your Honor asked her a question—asked her questions, at least on one occasion I remember that she didn't seem to follow the question and you had to go back and address her and so we found that to be a problem with us, specifically when I asked her about proof of the element of the crime and if she would require anything else. She said she would ask questions. She would want to know certain things. Those were concerns that we had that either she didn't understand sometimes—I don't—can't say that she wasn't paying attention. I don't know. We just don't

know what the cause of it was, but we could see the result of that concern was her sitting over a long trial whenever she had that difficulty even during this selection.

The trial court then allowed defendants an opportunity to respond. Queen's counsel reiterated that eight out of the State's first ten peremptory challenges were exercised on African-American or other minority prospective jurors and observed that "the Court was present when this voir dire was done, was able to observe these individuals." Tirado's counsel also pointed out the number of minority prospective jurors that had been excused by the prosecution. The court noted that both the prosecutor and defense counsel had consented to excusing a number of jurors, both Caucasian and minorities, that might otherwise have been challenged, and then found:

> [T]he stated reasons for excusing each of the named jurors, specifically Chester Goodwin, Cynthia Johnson, Mary Morrisey, Amilcar Picart, and Regina London, does have a basis in fact. That it is not pretextual in the Court's opinion and the state has rebutted to the Court's satisfaction the prima facie showing made by the defense in its discrimination. And, therefore, the objection made by the defendants and each of them to the state's exercise of peremptory challenge to excuse these jurors named by the Court is denied and the state may exercise those peremptory challenges.

Defendants argue that even though the State gave "articulable" reasons for exercising its peremptory challenges, the trial court's finding that these reasons were non-pretextual was not based on an adequate inquiry. Stated differently, defendants argue that the trial court failed properly to address the third *Batson* inquiry, whether the proffered reasons were "legitimate or a pretext." *State v. Porter*, 326 N.C. 489, 498, 391 S.E.2d 144, 150 (1990). The findings quoted above indicate that the court was fully aware of the three *Batson* requirements, so the issue before us is whether the court's determinations were based on sufficient findings. Because the trial court was in the best position to assess the prosecutor's credibility, we will not overturn its resolution of this issue absent clear error. *State v. Lemons*, 348 N.C. 335, 361, 501 S.E.2d 309, 325 (1998), *sentence vacated on other grounds*, 527 U.S. 1018, 144 L. Ed. 2d 768 (1999).

This third prong in a *Batson* analysis requires the trial court to consider various factors, such as the

STATE v. TIRADO

[358 N.C. 551 (2004)]

"susceptibility of the particular case to racial discrimination, whether the State used all of its peremptory challenges, the race of witnesses in the case, questions and statements by the prosecutor during jury selection which tend to support or refute an inference of discrimination, and whether the State has accepted any African-American jurors."

*State v. Golphin*, 352 N.C. at 427, 533 S.E.2d at 211 (quoting *State v. White*, 349 N.C. at 548-49, 508 S.E.2d at 262).

Tirado is of mixed African-American and Hispanic descent, while Queen is African-American. The two murder victims, Moore and Lambert, were white, and the surviving kidnapping victim, Cheeseborough, was African-American. The State did not exhaust its peremptory challenges while selecting the first twelve jurors and four alternates. The jury originally seated was racially diverse, consisting of three white males, two white females, one Filipino-Hawaiian male, one Asian female, one Hispanic male, one Hispanic female, two African-American females, and one African-American male.[1] Of the four alternate jurors selected, two were African-American and two were white. In addition, the trial court also stated that it considered its own observations of each prospective juror and the various exchanges between the court, the prosecutor, and the prospective jurors.

These factors, taken together, provide a wholly adequate basis for the court's determination that the prosecutor's facially race-neutral explanations for these peremptory challenges were race-neutral in fact. Accordingly, we uphold the trial court's ruling that defendants did not meet their burden of showing purposeful discrimination.

These assignments of error are overruled.

[3] Next, defendants contend that the trial court violated its statutory duty under N.C.G.S. § 15A-1214(a) to ensure that jury selection was conducted in a random manner. Defendants argue that as a result, their state and federal constitutional rights to a fair and impartial jury were violated. Defendants present a two-fold argument. They first argue that the trial court's use of panels during jury selection resulted in the parties having advance knowledge of the identity of

---

1. Prior to the jury being empaneled, juror number two, who identified himself as Filipino-Hawaiian, was excused because of a medical problem. Alternate juror number one, an African-American female, took his place.

STATE v. TIRADO

[358 N.C. 551 (2004)]

the next prospective juror to be called. Second, defendants argue that the court's placing prospective juror Janie Swindell into a particular panel resulted in a non-random system of selection.

Constitutional questions not raised and passed on by the trial court will not ordinarily be considered on appeal. *State v. Benson*, 323 N.C. 318, 322, 372 S.E.2d 517, 519 (1988). Statutory violations, however, are reviewable regardless of objections at the trial court. *State v. Golphin*, 352 N.C. at 411, 533 S.E.2d at 202. Here, defendants raised no objection to the use of panels for jury selection or the manner in which the trial court placed prospective jurors into panels. Therefore, defendants waived review of the constitutionality of the trial court's actions. *See id.*

Turning to the alleged statutory violations, N.C.G.S. § 15A-1214(a) provides that "[t]he clerk, under the supervision of the presiding judge, must call jurors from the panel by a system of random selection which precludes advance knowledge of the identity of the next juror to be called." N.C.G.S. § 15A-1214(a) (2003). The statute neither prescribes nor proscribes any particular method of achieving random selection. *See id.* Any challenge to a jury panel:

(1) May be made only on the ground that the jurors were not selected or drawn according to law.

(2) Must be in writing.

(3) Must specify the facts constituting the ground of challenge.

(4) Must be made and decided before any juror is examined.

N.C.G.S. § 15A-1211(c)(1), (2), (3), (4) (2003). Although this statute apparently uses the term "panel" to refer to the entire jury pool or venire, we have also applied it where challenges were raised to the procedures used by the trial court to divide the entire jury pool into smaller and more manageable groups (or "panels") of jurors who are questioned as part of the voir dire process. *See State v. Wiley*, 355 N.C. 592, 606-07, 565 S.E.2d 22, 34-35 (2002). In this case, defendants did not follow the statutorily mandated procedure for challenging the court's use of panels of jurors. As a result, both defendants waived review of their assignments of error as to this issue. *See id.* at 607, 565 S.E.2d at 34-35 (defendant waived assignment of error regarding challenge to division of jurors into panels because he failed to comply with N.C.G.S. § 15A-1211(c)); *see also State v. Golphin*, 352 N.C. at 411-12, 533 S.E.2d at 202.

Defendants further contend that a specific violation of the randomness requirement occurred when the trial court placed prospective juror Janie Swindell into a particular panel. Defendants argue that because the trial court acted contrary to statutory mandate, their right to appeal the action is preserved despite a failure to object at trial. *See State v. Jones*, 336 N.C. 490, 497, 445 S.E.2d 23, 26 (1994). Prospective juror Swindell, who was selected to be in panel G, did not answer in court when her name was called. Once all the names had been called for panel G, the court asked again about Swindell, but she still did not respond. After the remaining prospective jurors were called and placed into panels, the court made inquiry of the individuals who were still in the courtroom. At that point, Swindell was identified. She reported that she had not heard her name called, and a deputy pointed out that Swindell was wearing a hearing aid. The judge directed the clerk to place her into panel L, the final panel. Later, when Swindell's panel was called to the jury box for questioning, the judge noted that Swindell demonstrated an inability to hear or to understand questions and instructions. Based on these observations, all parties consented to the court's excusing of Swindell.

This issue has been resolved by our ruling in *State v. Golphin*, 352 N.C. at 413-14, 533 S.E.2d at 203-04. In that case, the trial court divided the prospective jurors into panels and placed members with hardships or whose written excuses had been denied in the last panel. Although the defendants did not raise a contemporaneous objection to the procedure, they later argued that the requirement of random selection had been violated. Citing *State v. Harris*, 338 N.C. 211, 227, 449 S.E.2d 462, 470 (1994), we held that the "right to challenge is not a right to select but to reject a juror" and concluded that the defendant had demonstrated no prejudice. *State v. Golphin*, 352 N.C. at 414, 533 S.E.2d at 204. In the case at bar, neither defendant was forced to accept an undesirable juror, and in fact, defendants consented to Swindell's excusal. The trial judge, confronted with a problem caused by Swindell's apparent disability, fashioned a reasonable response. Although we do not determine whether the court's action violated N.C.G.S. § 15A-1214, even if there were a violation, neither defendant can demonstrate prejudice. *See State v. Lawrence*, 352 N.C. 1, 13, 530 S.E.2d 807, 815 (2000), *cert. denied*, 531 U.S. 1083, 148 L. Ed. 2d 684 (2001).

These assignments of error are overruled.

[4] Defendants Tirado and Queen contend that the trial court erred by excusing prospective juror Sarah McMillan as not qualified.

Defendants argue that, even though McMillan had moved to Raleigh, in Wake County, she was nevertheless a "permanent" resident of Cumberland County and qualified to serve as a juror. Because defendants did not object when the court excused McMillan, they waived appellate review of this issue. *See State v. Golphin*, 352 N.C. at 424, 533 S.E.2d at 209-10 (defendant who suggested that a juror who had served on a federal jury within two years be excused but did not object on constitutional grounds failed to preserve the issue for appellate review). In addition, as to any alleged statutory violation that defendants argue is preserved for appellate review, we conclude that the excusal of prospective juror McMillan was proper. North Carolina General Statute § 9-3 provides: "All persons are qualified to serve as jurors and to be included on the jury list who are citizens of the State and residents of the county . . . . Persons not qualified under this section are subject to challenge for cause." N.C.G.S. § 9-3 (2003). In addition, N.C.G.S. § 15A-1211(b) states that the trial judge must decide "all questions concerning the competency of jurors." N.C.G.S. § 15A-1211(b) (2003). In this case, the record supports the trial court's ruling that McMillan was not qualified for service. On 9 February 2000, as jury selection began, the trial judge informed prospective jurors of the grounds for disqualification and asked those who believed they were not qualified to present their reasons. The following exchange ensued:

THE COURT: Ma'am?

[PROSPECTIVE JUROR McMILLAN]: Sarah McMillan.

THE COURT: Yes, ma'am?

[PROSPECTIVE JUROR McMILLAN]: I live in Raleigh.

THE COURT: You do not live in Cumberland County?

[PROSPECTIVE JUROR McMILLAN]: No, sir.

THE COURT: When did you move, ma'am?

[PROSPECTIVE JUROR McMILLAN]: November.

THE COURT: And how did you get the summons? Was it forwarded to you?

[PROSPECTIVE JUROR McMILLAN]: My permanent address is here with my mom. I was born and raised in Fayetteville so—I've lived in Raleigh since—

THE COURT: So this went to your mom's house?

[PROSPECTIVE JUROR MCMILLAN]: Luckily she opened it I would say two days ago.

The trial judge then asked if either the State or the defendants wished to be heard. When neither expressed any objection, the trial judge excused McMillan from service because she was no longer a resident of Cumberland County. This record adequately establishes that the trial court properly executed its authority under N.C.G.S. § 15A-1211(b) to determine that prospective juror McMillan failed to meet the statutory requirements to sit as a Cumberland County juror.

These assignments of error are overruled.

## GUILT-INNOCENCE PHASE ISSUES

[5] Both Tirado and Queen assign error to the trial court's instructions to the jury on the kidnapping charges, arguing that the trial court instructed on theories not alleged in the indictments. Defendants further contend that this error also skewed the sentencing proceeding because the jury found as to both defendants the aggravating circumstance that the murder was committed while defendants engaged in the commission of first-degree kidnapping. According to defendants, the erroneous finding of this aggravating circumstance warped the sentencing jury's balancing of all the aggravating and mitigating circumstances found by the jury.

Defendants acknowledge that they did not object to the instructions at trial, so we consider this issue under the plain error standard of review. See N.C. R. App. P. 10(b)(2), (c)(4). Under such an analysis, defendants must show that the instructions were erroneous and that absent the erroneous instructions, a jury probably would have returned a different verdict. N.C.G.S. § 15A-1443(a) (2003). The error must be "so fundamental that it denied the defendant a fair trial and quite probably tilted the scales against him." *State v. Collins*, 334 N.C. 54, 62, 431 S.E.2d 188, 193 (1993). "It is the rare case in which an improper instruction will justify reversal of a criminal conviction when no objection has been made in the trial court." *Henderson v. Kibbe*, 431 U.S. 145, 154, 52 L. Ed. 2d 203, 212 (1977).

Error arises when a trial judge permits a jury to convict upon an abstract theory not supported by the bill of indictment. *State v. Taylor*, 301 N.C. 164, 170, 270 S.E.2d 409, 413 (1980). This Court has held such error to be prejudicial when the trial court's instruc-

tion as to the defendant's underlying intent or purpose in committing a kidnapping differs from that alleged in the indictment. *See State v. Brown*, 312 N.C. 237, 249, 321 S.E.2d 856, 863 (1984) (holding that when the trial court charged the jury on an additional purpose for kidnapping not listed in the indictment and the State presented no evidence on such theory, the jury instructions constituted plain error); *see also State v. Taylor*, 301 N.C. at 171, 270 S.E.2d at 413-14 (holding that complete failure to instruct the jury on the theory charged in the bill of indictment together with instructions based on theories not charged in the indictment constituted prejudicial error); *State v. Dammons*, 293 N.C. 263, 272, 237 S.E.2d 834, 841 (1977) (holding that where theories of the crime were "neither supported by the evidence nor charged in the bill of indictment," the instructions constituted prejudicial error). However, we have also found no plain error where the trial court's instruction included the purpose that was listed in the indictment and where compelling evidence had been presented to support an additional element or elements not included in the indictment as to which the court had nevertheless instructed. *State v. Lucas*, 353 N.C. 568, 588, 548 S.E.2d 712, 726 (2001).

Here, the indictments for Lambert's and Moore's kidnapping alleged that each defendant confined, restrained, and removed the victims for the purpose of "facilitating the commission of a felony." The trial court charged the jury that it could find each defendant guilty if it found that the defendant, acting either by himself or with others, "removed" Lambert or Moore for the purpose of "facilitating the defendant's or another person's commission of robbery with a firearm or doing serious bodily injury to the person so removed." Similarly, the indictment for Cheeseborough's kidnapping alleged that each defendant confined, restrained, and removed her for the "purpose of doing serious bodily injury to her." The trial court charged the jury that it could find defendants guilty if it found that each, acting by himself or with others, removed the victim for the purpose of "facilitating . . . commission of robbery with a firearm or for the purpose of doing serious bodily injury." Thus, as to each kidnapping charge relating to victims Lambert and Moore, the jury was instructed as to particular purposes for the kidnapping that had not been specified in the indictment and as to the kidnapping charge relating to victim Cheeseborough, the jury was instructed on the purpose set out in the indictment, along with an additional purpose that had not been alleged in the indictment.

Because the instructions given by the trial court contained purposes not charged in the respective indictments, these instructions were erroneous. However, after examining the instructions and the record in its entirety, we cannot say that the defect was "a 'fundamental error, something so basic, so prejudicial, so lacking in its elements that justice cannot have been done.'" *United States v. McCaskill*, 676 F.2d 995, 1002 (4th Cir.) (footnote omitted), *cert. denied*, 459 U.S. 1018, 74 L. Ed. 2d 513 (1982) (quoting *United States v. Coppola*, 486 F.2d 882, 884 (10th Cir. 1973), *cert. denied*, 415 U.S. 948, 39 L. Ed. 2d 563 (1974)). As to victims Lambert and Moore, the indictments did not specify any particular underlying felony, *see State v. Freeman*, 314 N.C. 432, 435, 333 S.E.2d 743, 745 (1985), while the trial court instructed as to two possible underlying felonies that the jury could find. Compelling evidence was presented at trial that defendants or members of the gang with whom defendants were acting in concert kidnapped these victims both for the purpose of facilitating the commission of armed robbery and for the purpose of doing serious bodily injury to each victim. As a result, the instruction placed a higher burden of proof on the State by limiting the underlying felonies that the jury could find to support the kidnapping charge. As to victim Cheeseborough, the evidence supported both the theory set out in the indictment and the additional theory set out in the trial court's instructions. Accordingly, we conclude that a different result would not have been reached had the trial court instructed only on the purpose charged in the indictment, and that the error in the instructions was not prejudicial. *See State v. Lucas*, 353 N.C. at 588, 548 S.E.2d at 726. Because there was no prejudicial error in the instructions, we also conclude that the sentencing proceeding was not improperly compromised.

These assignments of error are overruled.

[6] Defendants next contend that the trial court erred in entering judgments against them based on multiple convictions of conspiracy when the State's evidence was insufficient to prove the existence of more than a single conspiracy. As to victims Moore and Lambert, each defendant was indicted for one count of conspiracy to commit first-degree murder, one count of conspiracy to commit first-degree kidnapping, and one count of conspiracy to commit robbery with a dangerous weapon. As to victim Cheeseborough, each defendant was indicted for one count of conspiracy to commit first-degree murder. Defendants argue that because all of the offenses were committed as part of a continuing series of events on 16-17 August 1998, there was

no evidence of separate and distinct agreements to justify convictions for more than a single count of criminal conspiracy.

The question of whether multiple agreements constitute a single conspiracy or multiple conspiracies is a question of fact for the jury. *State v. Rozier*, 69 N.C. App. 38, 54, 316 S.E.2d 893, 903, *cert. denied*, 312 N.C. 88, 321 S.E.2d 907 (1984). The nature of the agreement or agreements, the objectives of the conspiracies, the time interval between them, the number of participants, and the number of meetings are all factors that may be considered. *State v. Dalton*, 122 N.C. App. 666, 672-73, 471 S.E.2d 657, 661-62 (1996). "Ordinarily, the conspiracy ends with the attainment of its criminal objectives, but precisely when this occurs may vary from case to case." *State v. Gary*, 78 N.C. App. 29, 37, 337 S.E.2d 70, 76 (1985), *disc. rev. denied*, 316 N.C. 197, 341 S.E.2d 586 (1986).

In the case at bar, the evidence in the record supports the existence of multiple separate conspiracies. As to the count of conspiracy to commit first-degree murder against Debra Cheeseborough, the State's evidence showed that Walters assigned a mission to Douglas, Black, and Nevills, directing them to find a victim to rob, steal the victim's car, put the victim in the trunk of the car, and then return to Walters' residence within an hour and a half. During the abduction, Nevills told Cheeseborough that if she cooperated, she would not be hurt. This evidence indicates that Douglas, Black, and Nevills did not anticipate Cheeseborough's attempted murder, but instead thought that their mission was auto theft, armed robbery, and kidnapping. The plan to kill Cheeseborough formed during the course of the kidnapping, after she was abducted and brought to Walters' residence, where the remainder of the gang gathered around the car and argued over who was going to shoot her. Black testified at trial that defendant Tirado stated, "I'll shoot the bitch." Defendant Queen then told defendant Tirado not to let anyone go anywhere, and with Cheeseborough still in the trunk, Queen, Walters, Douglas, and Frink drove away in Cheeseborough's car. Black testified that the rest of the gang remained at Walters' trailer, and that defendant Tirado mumbled several times, "Damn, they should have let me go." The four gang members drove Cheeseborough to Smith Lake, where Walters shot Cheeseborough numerous times.

As to the three counts of conspiracy for crimes committed against Susan Moore and Tracy Lambert, the State's evidence showed that after Cheeseborough was left for dead, the gang reassembled at Walters' residence and separate new conspiracies were hatched.

When Walters complained that the gang needed another car, a gang member instructed Black, Douglas, and Tucker to go on another mission. Defendant Queen, accompanied by Walters, Frink, Black, Douglas, and Tucker, drove Cheeseborough's car while the others eventually targeted the 1989 Pontiac Grand Prix driven by Susan Moore and in which Tracy Lambert was a passenger. The gang members trapped Moore's car at the end of a dead-end road and stole the vehicle at gunpoint. Tucker and Douglas forced Moore and Lambert into Moore's trunk, then Black, Douglas, and Tucker returned to Walters' trailer. At that point, Walters' announced reason for the group's leaving the residence, to obtain another car, had been accomplished. Once again, the entire gang then gathered to discuss what to do with the women. Amid some disagreement, the gang drove Moore and Lambert to a location in Linden, where Queen shot Lambert in the head and Tirado shot Moore in the head. These shootings marked the completion of the gang's last conspiracy, to murder Moore and Lambert.

A rational juror, considering this series of meetings, the variety of locations and participants, their different objectives, and the statements of conspirators, could readily find the evidence established multiple separate conspiracies, rather than one single conspiracy. Moreover, we note that neither defendant objected to the conspiracy charges submitted to the jury.

These assignments of error are overruled.

[7] Next, Tirado and Queen argue that the trial court erred by submitting to the jury both attempted first-degree murder and assault with a deadly weapon with intent to kill inflicting serious injury, and by imposing consecutive sentences for these offenses in violation of their state and federal constitutional rights to be free from double jeopardy. The Double Jeopardy Clause of the Fifth Amendment states that no person shall "be subject for the same offense to be twice put in jeopardy of life or limb." U.S. Const. amend. V; *see also* N.C. Const. art. I, § 19. The Clause protects against three distinct abuses: (1) a second prosecution for the same offense after acquittal, (2) a second prosecution for the same offense after conviction, and (3) multiple punishments for the same offense. *North Carolina v. Pearce*, 395 U.S. 711, 717, 23 L. Ed. 2d 656, 664-65 (1969), *overruled on other grounds by Alabama v. Smith*, 490 U.S. 794, 104 L. Ed. 2d 865 (1989); *see also State v. Murray*, 310 N.C. 541, 547, 313 S.E.2d 523, 528 (1984), *overruled on other grounds by State v. White*, 322 N.C. 506, 369 S.E.2d

813 (1988). Defendants assert that they have impermissibly received multiple punishments for the same offense.

This Court has recognized that:

> [E]ven where evidence to support two or more offenses overlaps, double jeopardy does not occur unless the evidence required to support the two convictions is identical. If proof of an additional fact is required for each conviction which is not required for the other, even though some of the same acts must be proved in the trial of each, the offenses are not the same.

*State v. Murray*, 310 N.C. at 548, 313 S.E.2d at 529. The elements of attempted first-degree murder are: (1) a specific intent to kill another; (2) an overt act calculated to carry out that intent, which goes beyond mere preparation; (3) malice, premeditation, and deliberation accompanying the act; and (4) failure to complete the intended killing. *See* N.C.G.S. § 14-17 (2003); *State v. Peoples*, 141 N.C. App. 115, 117, 539 S.E.2d 25, 28 (2000). The elements of assault with a deadly weapon with intent to kill inflicting serious injury are: (1) an assault, (2) with the use of a deadly weapon, (3) with an intent to kill, and (4) inflicting serious injury, not resulting in death. *See* N.C.G.S. § 14-32(a) (2003); *State v. Peoples*, 141 N.C. App. at 117, 539 S.E.2d at 28. Therefore, assault with a deadly weapon with intent to kill inflicting serious injury requires proof of the use of a deadly weapon, as well as proof of serious injury, neither of which are elements of attempted first-degree murder. *See* N.C.G.S. §§ 14-17, -32(a). Similarly, attempted first-degree murder includes premeditation and deliberation, which are not elements of assault with a deadly weapon with intent to kill inflicting serious injury. *Id.* Because each offense contains at least one element not included in the other, defendants have not been subjected to double jeopardy.

These assignments of error are overruled.

Having determined that we find no error in any of defendants' collective arguments, we now address each defendant's separate assignments of error.

## DEFENDANT TIRADO

### GUILT-INNOCENCE PHASE ISSUES

[8] Defendant Tirado claims that the trial court erred when it allowed one of the prosecutors to argue to the jury at the close of the guilt-innocence phase that co-defendant Queen's post-arrest state-

STATE v. TIRADO

[358 N.C. 551 (2004)]

ments corroborated the testimony of Ione Black regarding the events of 16-17 August 1998. Tirado contends that because Queen's statements were inadmissible against Tirado, the trial court's ruling deprived him of his rights under the North Carolina and United States Constitutions to due process, to confrontation, and to be free from cruel and unusual punishment.

An out-of-court statement is admissible as an exception to the hearsay rule when it was made by the party against whom it is being offered. N.C.G.S. § 8C-1, Rule 801(d) (2003). However, when a nontestifying co-defendant's post-arrest statement is admitted in evidence at a joint trial in a manner that invites or permits the jury to use the statement against the non-declarant defendant, fundamental conflicts with the non-declarant defendant's state and federal right to confrontation may arise. *See Lilly v. Virginia*, 527 U.S. 116, 144 L. Ed. 2d 117 (1999). As a result, the United States Supreme Court has held that before a nontestifying co-defendant's post-arrest statement may be admitted in evidence, it must be redacted to remove all references to the non-declarant defendant, and the jury should be instructed that the statement was admitted as evidence only against the declarant co-defendant. *Gray v. Maryland*, 523 U.S. 185, 140 L. Ed. 2d 294 (1998); *Bruton v. United States*, 391 U.S. 123, 20 L. Ed. 2d 476. Here, having ruled that Queen's statements would be redacted to delete all references to Tirado, the trial court admitted them after correctly instructing the jury that they could be considered only as evidence against Queen and could not be considered by the jury for any purpose against Tirado.

During closing arguments, one of the prosecutors argued that Queen's post-arrest statements to law enforcement officers corroborated the testimony of Ione Black regarding the events of 16-17 August 1998. Tirado's attorney objected as soon as the prosecutor mentioned Queen's statement and advised the court of the basis of the objection, but the objection was overruled. Thereafter, the prosecutor made such arguments as, "Ione told you about these things. She told you that they had to go on missions. Eric Queen told you the same thing." The prosecutor then argued that all of the evidence presented to the jury, including Queen's statements, corroborated Ione Black's testimony. Tirado contends that the prosecutor's arguments that Queen's statement corroborated Black's testimony had the effect of inviting the jury to consider Queen's statement as implicating Tirado.

The court in its final instructions advised the jury that "[i]f you find that Mr. Queen made the statements, you may consider them against Mr. Queen and only against Mr. Queen. It has—they have no relevance at all to Mr. Tirado's guilt or innocence and you may not consider any statement against Mr. Tirado in any way whatsoever." In addition, at appropriate times during Black's testimony, the trial court gave accurate limiting instructions to the jury restricting the purposes for which it could consider her hearsay evidence and the hearsay statements made by her co-conspirators. The law presumes that jurors follow the court's instructions. *Parker v. Randolph*, 442 U.S. 62, 73, 60 L. Ed. 2d 713, 723 (1979). Moreover, the prosecutor advised the jury, shortly after beginning her closing argument: "Remember as I discuss the evidence with you the purpose for which the judge said that evidence could come in and you could hear it. I'm arguing it for no other purpose other than what the judge instructed you that it could come in as." Therefore, in light of the court's limiting instruction to the jury that Queen's statements were not to be used against Tirado and the prosecutor's statement reminding the jury of the defined purpose for which the evidence had been admitted, we conclude that Tirado's contention that the prosecutor improperly used the statements of Queen to corroborate Black and thereby bolster the case against Tirado is without merit.

Nonetheless, even assuming *arguendo* that the trial court erred in overruling Tirado's objection to this argument, the error was harmless beyond a reasonable doubt. *See* N.C.G.S. § 15A-1443(b) (2003); *see also State v. Spaulding*, 288 N.C. 397, 407-08, 219 S.E.2d 178, 185 (1975), *vacated in part on other grounds*, 428 U.S. 904, 49 L. Ed. 2d 1210 (1976) (holding that erroneous admission of a defendant's out-of-court statement against a co-defendant was not reversible error despite violation of defendant's constitutional rights when the total evidence against the non-declaring defendant was so overwhelming that the error was harmless). Substantial physical and testimonial evidence independent of Queen's statements corroborated Black's testimony against Tirado. The testimony of Debra Cheeseborough, the only surviving victim, was consistent with Black's testimony as she and Black provided markedly similar descriptions of Cheeseborough's abduction. Black testified that the gang members burned a purse and some identifications, and police recovered Cheeseborough's burned wallet at Walters' Davis Street address. Blue material recovered from the wound tracks of victims Moore and Lambert was chemically consistent with the blue nail polish seized from Walters' residence. Tirado's fingerprint was located on one of

the boxes of cartridges that was recovered from the stolen vehicles. This and other similar evidence satisfies us that any impermissible references to Queen's statements during closing arguments were harmless beyond a reasonable doubt. This assignment of error is overruled.

[9] Tirado next asserts that the evidence was insufficient to sustain his convictions for the substantive offenses of attempted first-degree murder, assault with a deadly weapon with intent to kill inflicting serious injury, kidnapping, and robbery with a dangerous weapon, all of which related to crimes committed against Cheeseborough. He argues that the trial court erred when it denied his motions to dismiss the substantive charges because he was neither actually nor constructively present when the crimes were committed.

When reviewing the sufficiency of the evidence, we view the evidence in the light most favorable to the State, resolving all conflicts in the evidence in favor of the State and giving it the benefit of all reasonable inferences. *State v. Lucas*, 353 N.C. at 581, 548 S.E.2d at 721. Moreover, "[c]ircumstantial evidence may withstand a motion to dismiss and support a conviction even when the evidence does not rule out every hypothesis of innocence." *State v. Stone*, 323 N.C. 447, 452, 373 S.E.2d 430, 433 (1988). The jurors must decide whether the evidence satisfies them beyond a reasonable doubt that the defendant is guilty. *State v. Rowland*, 263 N.C. 353, 358, 139 S.E.2d 661, 665 (1965).

When addressing the offenses with which Tirado had been indicted relating to Cheeseborough, the trial court instructed the jury as to aiding and abetting and acting in concert, specifically noting that if two or more persons join in a purpose to commit offenses, each was guilty if actually or constructively present. This instruction is consistent with the law of North Carolina. *See State v. Laws*, 325 N.C. 81, 97, 381 S.E.2d 609, 618 (1989), *judgment vacated on other grounds*, 494 U.S. 1022, 108 L. Ed. 2d 603 (1990). Therefore, because Tirado was not physically present, we must consider whether he was constructively present when the substantive offenses against Cheeseborough were committed.

We have held that where a defendant and a co-defendant shared a criminal intent and the co-defendant who actually committed the crime knew of the shared intent, if the defendant was in a position to aid or encourage the co-defendant when the co-defendant committed the offense, the defendant was constructively present and acting in concert with the co-defendant. *State v. Willis*, 332 N.C. 151, 179, 420

S.E.2d 158, 171 (1992). Here, the State's evidence showed that Tirado belonged to the Crips gang and was among those who participated in the initiation of new members on the night of 16-17 August 1998. Tirado met with the others at Walters' residence prior to her sending the initiates on specified criminal missions, participated in obtaining bullets to support the missions, and painted the gang's color on the bullets. After Cheeseborough was abducted and brought back to Walters' residence, Tirado asked to be allowed to shoot her and grumbled when others took the job. Based on this record, we conclude that the State presented sufficient evidence to allow a rational juror to conclude that Tirado joined with one or more persons in the purpose to kidnap, rob, assault with a deadly weapon, and attempt to murder Cheeseborough and was constructively present when these crimes were carried out. Accordingly, the trial court properly denied Tirado's motions to dismiss the charges for substantive offenses against Cheeseborough. This assignment of error is overruled.

## SENTENCING PROCEEDING ISSUE

[10] Tirado argues that he is entitled to a new capital sentencing proceeding because the trial court failed to comply with the statutory mandate for an individual poll of jurors immediately upon delivery of a sentencing recommendation. He claims that this error deprived him of his statutory right to an individual poll of the sentencing jury at a time before the jury became subject to outside influences, and of his state and federal constitutional rights to trial by jury, to a unanimous verdict, to due process of law, and to be free from cruel and unusual punishment.

As noted above, the trial court bifurcated the sentencing proceedings so that Queen's unredacted statement could be read to the jury without prejudicing Tirado. Tirado's capital sentencing proceeding was held first. When the jury delivered its sentencing verdicts as to Tirado on Friday, 7 April 2000, the trial court examined the verdict forms for consistency, then sealed them and delivered them to the clerk. The court instructed the jurors that "it will be necessary for you folks to be polled individually as you were after the verdict in the first part of the case when the verdict is opened and announced for the record," and then excused the jurors with further instructions to return the following week for the sentencing proceeding for Queen.

Thereafter, during Queen's sentencing proceeding on 11 April 2000, his unredacted statements implicating Tirado were admitted into evidence. The jury again deliberated and, that same day,

STATE v. TIRADO

[358 N.C. 551 (2004)]

returned its sentencing verdicts as to Queen. The trial judge unsealed the sentencing verdicts delivered the previous week for Tirado, and the clerk announced both capital verdicts. When the trial judge began to poll the jury, Tirado objected and moved for a mistrial on the ground that the poll was invalid because the jury had been exposed to extraneous material after Tirado's sentencing phase verdict was delivered. The trial court overruled the objection and denied the motion, then proceeded to poll the jury individually on the sentencing verdicts for Tirado and, separately, for Queen.

In a capital case, the right to an individual jury poll is statutorily mandated. North Carolina General Statute § 15A-2000(b) provides, in pertinent part, that "[u]pon delivery of the sentence recommendation by the foreman of the jury, the jury shall be individually polled to establish whether each juror concurs and agrees to the sentence recommendation returned." N.C.G.S. § 15A-2000(b) (2000). The purpose of an individual poll of the jury is:

> [T]o give each juror an opportunity, before the verdict is recorded, to declare in open court his assent to the verdict which the foreman has returned, and thus to enable the court and the parties to ascertain *with certainty* that a unanimous verdict has been in fact reached and that no juror has been coerced or induced to agree to a verdict to which he has not fully assented.

*Davis v. State*, 273 N.C. 533, 541, 160 S.E.2d 697, 703 (1968). If the record does not establish affirmatively that each individual juror assents to the verdict returned, the verdict is invalid. *State v. Dow*, 246 N.C. 644, 646, 99 S.E.2d 860, 862 (1957). The jury poll should occur "[u]pon delivery of the sentence recommendation by the foreman of the jury." N.C.G.S. § 15A-2000(b). The rationale behind the timing of the poll is to ensure that nothing extraneous to the jury's deliberations can cause any of the jurors to change their minds. *State v. Black*, 328 N.C. 191, 198, 400 S.E.2d 398, 402-03 (1991). "[O]nce the jury is dispersed after rendering its verdict and later called back, it is not the same jury that rendered the verdict." *Id.* at 198, 400 S.E.2d at 403.

Here, the jury returned its sentence recommendation as to Tirado on 7 April 2000. The jurors were then excused for a weekend recess. When they reassembled on 11 April 2000 for Queen's sentencing proceeding, the jurors heard for the first time Queen's complete statement, which included a description of Tirado's participation in the planning and execution of the crimes. Therefore, Tirado's statutorily

mandated poll of the individual jurors occurred after the passage of several days and after the jury heard additional inculpatory evidence that the trial court had ruled inadmissible as to Tirado. As a result, the poll failed to measure each juror's intentions at the time the jury returned its sentencing verdicts as to Tirado. Under these circumstances, we believe it unlikely that any juror who was wavering when the verdict was returned on 7 April would have expressed any doubts when polled on 11 April.

Although counsel for both defendants had raised issues relating to Queen's statement and their joint trial, Tirado's attorney did not make a contemporaneous objection to the trial court's decision to defer polling the jurors. Instead, counsel moved for a mistrial after Queen's verdict was returned. The trial court denied the motion. The statute applicable to such motions states in pertinent part: "The judge must declare a mistrial upon the defendant's motion if there occurs during the trial an error or legal defect in the proceedings, . . . resulting in substantial and irreparable prejudice to the defendant's case." N.C.G.S. § 15A-1061 (2003). Here, the procedure followed by the trial court violated the provisions of N.C.G.S. § 15A-2000(b) because the poll was not timely and because the intervening evidence heard by the jury led to substantial and irreparable prejudice to Tirado. Accordingly, we hold that the trial court erred in denying Tirado's motion for mistrial and that he is entitled to a new sentencing proceeding. As a result, we need not address his remaining assignments of error related to sentencing.

## DEFENDANT QUEEN

### GUILT-INNOCENCE PHASE ISSUES

[11] Defendant Queen argues that the trial court erred when it dismissed juror Margaret Lucier during the trial. Queen argues that the trial court's handling of the matter was fundamentally unfair and constitutes reversible error, or in the alternative, that the trial court abused its discretion.

The record indicates that, after the trial had been under way for several weeks, a police officer from Spring Lake advised one of the prosecutors that juror Lucier was under investigation for embezzlement. The prosecutor notified the trial court and opposing counsel. Although the court recognized that Lucier had not been arrested and was presumed innocent, it posed the possibility of removing her from the jury. Both defendants objected. After addi-

tional inquiries, the trial judge stated, "if I determine to my satisfaction that there exists probable cause for an arrest warrant to issue or for the [S]tate to proceed with an indictment, I will exercise my discretion to take her off. I will not have a person in those circumstances sitting on the jury."

Three days later, after all the evidence had been presented and as the court was preparing to instruct the jury on issues related to defendants' guilt or innocence, Tirado changed his position. Tirado's counsel advised the court that "[w]e would concur with the Court's removal of—and would move to strike her for cause." Queen continued to oppose Lucier's removal. The court was then informed that felony warrants were pending against Lucier. The trial judge instructed the jury, and thereafter, in its discretion, discharged Lucier and replaced her with an alternate.

North Carolina General Statute § 15A-2000(a)(2) provides, in pertinent part, that

[i]f prior to the time that the trial jury begins its deliberations on the issue of penalty, any juror dies, becomes incapacitated or disqualified, or is discharged for any reason, an alternate juror shall become a part of the jury and serve in all respects as those selected on the regular trial panel.

N.C.G.S. § 15A-2000(a)(2) (2003); *see also* N.C.G.S. § 15A-1215(a) (2003). The decision to replace a juror with an alternate lies within the trial court's discretion. *State v. Nobles,* 350 N.C. at 513, 515 S.E.2d at 903.

"The trial judge has broad discretion in supervising the selection of the jury to the end that both the state and the defendant may receive a fair trial. This discretionary power to regulate the composition of the jury continues beyond empanelment. It is within the trial court's discretion to excuse a juror and substitute an alternate at any time before final submission of the case to the jury panel. These kinds of decisions relating to the competency and service of jurors are not reviewable on appeal absent a showing of abuse of discretion, or some imputed legal error."

*State v. McLaughlin,* 323 N.C. 68, 101, 372 S.E.2d 49, 70 (1988) (quoting *State v. Nelson,* 298 N.C. at 593, 260 S.E.2d at 644) (citations omitted)), *judgment vacated on other grounds,* 494 U.S. 1021, 108 L. Ed. 2d 601 (1990).

**STATE v. TIRADO**

[358 N.C. 551 (2004)]

Queen contends that the trial court improperly allowed the State to expedite juror Lucier's arrest, with the result that she was excused despite Queen's desire to keep her on the panel. However, the trial court took pains to ensure that the rights of both defendants to a fair trial were protected. The judge repeatedly expressed his desire not to interfere with law enforcement's investigation. When he finally discharged juror Lucier, the judge made the following findings:

> That the Court finds that this is absolutely necessary to preserve the integrity of the jury. That the juror has—the Court has a distinct concern that, aside from the appearance of impropriety and undermining the confidence of the public and the parties and the integrity of the jury's verdict in this case, that there might be some real issue as to whether or not Ms. Lucier's verdict would be completely fair and unbiased and based solely on the evidence if she recognizes or knows that she may be required to have dealings with the state concerning these charges against her.

> That the Court has not delayed, deferred or encouraged the preparation and/or service of these warrants nor attempted to interfere with the discretion of the district attorney and the law enforcement officers in the discharge of their official duties.

Therefore, when presented with this unusual situation, the trial court exercised the discretion allowed under N.C.G.S. § 15A-2000(a)(2) and our case law to replace juror Lucier with an alternate. The trial court's findings are fully supported by the record, and we see no abuse of discretion. This assignment of error is overruled.

[12] Queen next argues that the prosecutor failed to provide essential discovery as required by N.C.G.S. § 15A-903 and *Brady v. Maryland*, 373 U.S. 83, 10 L. Ed. 2d 215 (1963). The heart of Queen's claim is that the prosecution failed to disclose prior to trial his false exculpatory statement to investigators to the effect that he had not participated in the kidnapping of Moore and Lambert. Queen contends that, as a result, his strategy of seeking mitigation on the basis of his early cooperation was compromised, violating his federal and state constitutional and statutory rights.

Our review of the record reveals that, prior to trial, Queen filed a "Request for Voluntary Discovery" in which he sought, among other things, all of his written and oral statements. In response, Queen was given notes of an oral interview conducted by Sergeant Ray Wood at the Myrtle Beach Police Department. This interview began at 2:07

a.m. on 20 August 1998. However, at trial, Sergeant Wood provided direct testimony about two statements Queen made to him at different times on 20 August 1998. Sergeant Wood testified that during the first interview, conducted at 2:07 a.m., when Queen was asked about the shooting of Moore and Lambert, he responded that he "turned his back and heard pow, pow." Sergeant Wood testified that he disbelieved Queen and told him that the interview was over. Queen then admitted shooting one of the victims. Notes of this interview were ·provided to Queen prior to trial. Sergeant Wood then testified that the second interview began at 10:28 p.m. Notes of this examination were not provided to Queen prior to trial. During this interview, Queen advised Sergeant Wood that the investigators did not know everyone who had been involved, and then described the actions of "Carlos." In relating the substance of this second statement, Sergeant Wood testified that "Queen went on to state that the two white females were trying to drive out from the neighborhood when he was making a U-turn. Queen stated the two white females could not go anywhere and he left." In his cross-examination of Sergeant Wood, Queen's counsel stressed his client's cooperation. However, during the redirect examination, the prosecutor highlighted the fact that Queen initially made inaccurate self-serving statements to the sergeant.

Queen objected on the ground that, despite his request for voluntary discovery, he was unaware of the false exculpatory statement as to his role in the kidnapping. The trial court conducted a *voir dire* hearing and determined that the sergeants who had questioned Queen on 20 August 1998 had not turned over their interview notes containing Queen's false claim that he had not participated in the kidnapping of Moore and Lambert both because they did not believe Queen and because verbal skirmishing with suspects over details of a statement are routine during police interrogations. The trial court also ascertained that the district attorney's office had failed to advise the investigators that a prior discovery order entered in the case required notes of interviews be given to prosecutors for subsequent release to defense counsel. During this *voir dire*, Queen moved for a mistrial.

After hearing the evidence and considering the arguments of counsel, the trial court concluded that the only material before the jury that had not been provided to defense counsel prior to trial was Queen's statement to the effect that he was not involved in the kidnapping of Moore and Lambert. The trial court determined that the prosecutors had substantially complied with the requirements of

*Brady* and that Queen had not been prejudiced. Accordingly, the trial court denied Queen's motion for mistrial.

Queen argues that he was unfairly prejudiced because the State never gave him notice of a false exculpatory statement that could have altered his trial strategy of claiming to have been cooperative at all times. However, the trial court's determination that Queen was not unfairly prejudiced is adequately supported by the record. Queen's 2:07 a.m. statement, which had been given to him in a time-ly fashion and was the subject of pretrial motions pertaining to redaction and admissibility, contained Queen's initial claim that he did not shoot either Moore or Lambert. This same statement also includes the following: "Queen states he, Paco [Tirado], C-Lo [Frink] dropped Little 60 [Douglas], Star [Black] and Jr. [Tucker] off. Queen states that he told them he had to go back to the crib. He states they came back with the girls in the Grand Prix in the trunk." This portion of Queen's 2:07 a.m. statement is effectively indistinguishable from the corresponding portion of his unrevealed 10:28 p.m. statement, quoted above, in which he told Sergeant Wood that he left once the car containing the victims was pinned and they could not drive away.

"[T]he suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady v. Maryland*, 373 U.S. at 87, 10 L. Ed. 2d at 218. However, in *United States v. Agurs*, 427 U.S. 97, 49 L. Ed. 2d 342 (1976), the United States Supreme Court rejected the idea that every nondisclosure automatically constitutes reversible error and held that "prejudicial error must be determined by examining the materiality of the evidence." *State v. Howard*, 334 N.C. 602, 605, 433 S.E.2d 742, 744 (1993). "The evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *United States v. Bagley*, 473 U.S. 667, 682, 87 L. Ed. 2d 481, 494 (1985). We have also held that when determining whether the suppression of certain information was violative of a defendant's constitutional rights, "the focus should not be on the impact of the undisclosed evidence on the defendant's ability to prepare for trial, but rather should be on the effect of the nondisclosure on the outcome of the trial." *State v. Alston*, 307 N.C. 321, 337, 298 S.E.2d 631, 642 (1983). The defendant has the burden of

showing that the undisclosed evidence was material and affected the outcome of the trial. *Id.*

While we agree that Queen's 10:28 p.m. statement denying involvement in the kidnapping of Moore and Lambert is relevant to Queen's strategy of focusing on his cooperation in order to win mitigation in the capital case, we conclude that he failed to show any prejudice arising from the nondisclosure. Queen was properly provided his 2:07 a.m. statement in which he made the false initial claim that he had not shot either victim. Although the 10:28 p.m. statement contained Queen's false exculpatory statement that he did not participate in the kidnapping of these victims after their car was stopped, the 2:07 a.m. statement also contained a similar suggestion that Queen claimed to be elsewhere when these victims were kidnapped. Thus, Queen received pretrial notice that he had incorrectly told investigators on 20 August 1998 that he was not present when Moore and Lambert were kidnapped.

In addition, the record discloses that the 10:28 p.m. statement had no effect on the outcome of Queen's trial. His strategy of seeking mitigation on the basis of his cooperation was not compromised by the revealing at trial of his second statement. Queen presented his unredacted 2:07 a.m. statement to the jury during the sentencing proceeding and was able to argue to the jury that he was entitled to mitigation because of his cooperation. The trial judge peremptorily instructed the jury "[t]he defendant aided in the apprehension of another capital felon," and one or more jurors found both mitigating circumstances submitted by Queen regarding cooperation. We therefore conclude that the State's failure to disclose Queen's 10:28 p.m. statement did not constitute prejudicial error because there is no reasonable probability that timely providing it would have affected the outcome of Queen's trial. The judge did not abuse his discretion in denying Queen's motion for mistrial. This assignment of error is overruled.

[13] In his next assignment of error, Queen contends that he received multiple punishments for the same offense in violation of the prohibition against double jeopardy. Queen argues that he was punished twice for the murders of Lambert and Moore, once when convicted of first-degree murder and again when convicted of first-degree kidnapping based on a finding that the victims were seriously injured. Queen also argues that he was punished twice for serious injury to Cheeseborough, once when convicted of assault with a deadly weapon with intent to kill inflicting serious injury and again

when convicted of first-degree kidnapping based on a finding that the victim was seriously injured.

As detailed above, both the Fifth Amendment to the United States Constitution and Article I, Section 19 of the North Carolina Constitution protect against multiple punishments for the same offense. *See State v. Fernandez*, 346 N.C. 1, 18, 484 S.E.2d 350, 361 (1997). However, because Queen did not object to the submission of first-degree kidnapping or to the instructions on that offense, he has failed to preserve this issue for appellate review. *Id.* (defendant waived appellate review when he failed to object at trial to the submission of first-degree murder and first-degree kidnapping based on the murders); *see also State v. Mitchell*, 317 N.C. 661, 670, 346 S.E.2d 458, 463 (1986) (defendant waived appellate review when he did not raise the double jeopardy issue at trial).

Even assuming *arguendo* that the issue had been preserved, we conclude that double jeopardy does not apply here. In *Fernandez*, where the defendant raised a similar argument, we applied the test enunciated in *Blockburger v. United States*, 284 U.S. 299, 76 L. Ed. 306 (1932). *State v. Fernandez*, 346 N.C. at 19, 484 S.E.2d at 361-62. We follow that same analysis here.

Under our formulation of the *Blockburger* test,

> even where evidence to support two or more offenses overlaps, double jeopardy does not occur unless the evidence required to support the two convictions is identical. If proof of an additional fact is required for each conviction which is not required for the other, even though some of the same acts must be proved in the trial of each, the offenses are not the same.

*State v. Murray*, 310 N.C. at 548, 313 S.E.2d at 529. In the case at bar, each crime charged contains an element not required to be proved in the other. First-degree murder is the unlawful killing of another human being with malice and with premeditation and deliberation. N.C.G.S. § 14-17 (2003). First-degree kidnapping is: (a) the unlawful, nonconsensual confinement, restraint or removal of a person for the purpose of committing certain specified acts; and (b) either the failure to release the person in a safe place, or the injury or sexual assault of the person. N.C.G.S. § 14-39 (2003). Thus, as to victims Lambert and Moore, first-degree kidnapping is not a lesser-included offense of murder, and because each of these offenses contains an element that is not an element of the other, defendant was not subject

to double jeopardy. *State v. Fernandez*, 346 N.C. at 20, 484 S.E.2d at 362. Similarly, because the elements of assault with a deadly weapon inflicting serious injury and the elements of first-degree kidnapping do not coincide, Queen was not punished twice for inflicting the same injury on victim Cheeseborough.

These assignments of error are overruled.

## SENTENCING PROCEEDING ISSUES

**[14]** Queen contends that his federal and state constitutional right to individualized sentencing was violated when the trial court allowed the same jury to consider his and Tirado's sentences at separate sentencing proceedings. Queen argues that the Eighth Amendment to the United States Constitution mandates individualized consideration of a defendant's argument that he or she should be spared the death penalty. *See Lockett v. Ohio*, 438 U.S. 586, 605, 57 L. Ed. 2d 973, 990 (1978). Queen also contends that the trial court's procedures violated this Court's determination that a co-defendant's sentence is irrelevant in a capital sentencing determination. *See State v. Jaynes*, 353 N.C. 534, 563-64, 549 S.E.2d 179, 200-01 (2001), *cert. denied*, 535 U.S. 934, 152 L. Ed. 2d 220 (2002).

Although Queen objected to the separate sentencing proceeding, he based his objection on his concern that the jury might not be able to consider his cooperation with law enforcement as mitigating evidence, a consideration that the trial court later addressed. Thus, Queen's objection was not founded on an alleged constitutional violation. Constitutional claims not raised and passed on at trial will not ordinarily be considered on appeal. *State v. Golphin*, 352 N.C. at 411, 533 S.E.2d at 202; *State v. Benson*, 323 N.C. at 322, 372 S.E.2d at 519. Accordingly, Queen waived appellate review of this constitutional claim.

Even assuming *arguendo* that Queen did not waive appellate review, the trial court took care to ensure that the jury gave individualized consideration to his argument that he should be spared the death penalty. The trial judge admonished the jurors:

> Now, ladies and gentlemen, you have heard the evidence concerning Mr. Tirado and his sentencing and you have submitted a sentence recommendation for Mr. Tirado which has been sealed by the Court. I want to advise you now and instruct you now that as we commence this sentencing hearing for Eric Devon Queen, that if there was anything said in the sentencing hear-

ing concerning Mr. Queen, and I frankly don't personally re-member any mention at all of Mr. Queen in that sentencing hear-ing, but if there was anything that was said in that sentencing hearing which related to Mr. Queen, you may not consider any-thing that you heard in the sentencing hearing for Mr. Tirado against Mr. Queen.

Now, everything that you heard during the guilt-innocence phase of this trial as against each of the defendants certainly is something that you can consider as you consider your sentence recommendation for Mr. Queen, but you are not to consider any matter that was asserted in Mr. Tirado's sentencing hearing against Mr. Queen. If you understand and will follow that instruc-tion, raise your hand, please.

Let the record show that all the jurors have so indicated.

Because jurors are presumed to follow the instructions of the trial court, *State v. Hardy*, 353 N.C. 122, 138, 540 S.E.2d 334, 346 (2000), *cert. denied*, 534 U.S. 840, 151 L. Ed. 2d 56 (2001), we con-clude that Queen's constitutional right to individualized sentencing was not violated.

[15] Queen also contends that he was prejudiced because Tirado was sentenced first and the jury knew what the sentence was. He claims that, as a result, the consecutive sentencing proceedings vio-lated the principle that a defendant's sentence is irrelevant to the sen-tence of any co-defendant for the same murder. *See State v. Jaynes*, 353 N.C. at 563, 549 S.E.2d at 200-01. However, as quoted above, the trial court explicitly instructed the jury that they could not consider anything presented in Tirado's sentencing hearing against Queen and required the jury to consider separately the evidence as to any aggra-vating and mitigating circumstances for each defendant. Accordingly, the separate sentencing procedure used here does not implicate this Court's jurisprudence regarding the relevance of a co-defendant's sentence. The record reflects that the trial court severed the sen-tencing hearings of Tirado and Queen for the specific purpose of protecting the right of each to individualized sentencing. This as-signment of error is overruled.

[16] Queen next contends that his statutory right to the assistance of two attorneys was violated when one of his attorneys was absent dur-ing a portion of co-defendant Tirado's sentencing hearing. Although North Carolina General Statute § 7A-450(b1) provides, in pertinent

part, that "[a]n indigent person indicted for murder may not be tried where the State is seeking the death penalty without an assistant counsel being appointed in a timely manner," N.C.G.S. § 7A-450(b1) (2003), we have held that the statute "does not require, either expressly or impliedly, that *both* of a capital defendant's attorneys be present at *all* times for *all* matters." *State v. Thomas*, 350 N.C. 315, 337, 514 S.E.2d 486, 500, *cert. denied*, 528 U.S. 1006, 145 L. Ed. 2d 388 (1999). In *Thomas*, the trial court did not halt the proceedings whenever one of the defendant's appointed attorneys would briefly leave the courtroom. *Id.* Noting that two counsel had been appointed to represent the defendant months before the trial began, we concluded that the trial court properly complied with the statute and did not err.

Queen received the assistance of both of his attorneys throughout his entire trial and his individual sentencing proceeding. As detailed below, the trial court instructed that Queen and his counsel be present during Tirado's sentencing proceeding. However, on the final day that evidence was being presented at Tirado's sentencing proceeding, one of Queen's attorneys went on a previously scheduled vacation. Queen consented to the attorney's absence, and Queen and his other attorney remained. Thus, one of Queen's attorneys was not present during the cross- and redirect examination of Tirado's expert witness. In light of our holding in *Thomas* and defendant's acquiescence in the procedure, we hold that this absence, occurring during a portion of his co-defendent's sentencing hearing, did not violate Queen's statutory right to the assistance of two attorneys. This assignment of error is overruled.

[17] Queen contends that the trial court erred when it submitted to the jury the aggravating circumstance that the murders were "especially heinous, atrocious, or cruel." N.C.G.S. § 15A-2000(e)(9). Queen argues that there was insufficient evidence to support submission of this aggravating circumstance and that the circumstance is unconstitutionally vague. When " 'determining the sufficiency of the evidence to submit an aggravating circumstance to the jury, the trial court must consider the evidence in the light most favorable to the State, with the State entitled to every reasonable inference to be drawn therefrom, and discrepancies and contradictions resolved in favor of the State.' " *State v. Anthony*, 354 N.C. 372, 434, 555 S.E.2d 557, 596 (2001) (quoting *State v. Syriani*, 333 N.C. 350, 392, 428 S.E.2d 118, 141, *cert. denied*, 510 U.S. 948, 126 L. Ed. 2d 341 (1993)), *cert. denied*, 536 U.S. 930, 153 L. Ed. 2d 791 (2002). This Court has recognized sev-

eral categories of murders that warrant submission of the (e)(9) aggravating circumstance.

> The first type consists of those killings that are physically ago-nizing for the victim or which are in some other way dehumaniz-ing. *State v. Lloyd*, 321 N.C. 301, 319, 364 S.E.2d 316, 328, *sen-tence vacated on other grounds*, 488 U.S. 807, 102 L. Ed. 2d 18 (1988). The second type includes killings that are less violent but involve infliction of psychological torture by leaving the victim in his or her "last moments aware of but helpless to prevent impending death," *State v. Hamlet*, 312 N.C. [162,] 175, 321 S.E.2d [837,] 846 [(1984)], and thus may be considered "conscienceless, pitiless, or unnecessarily torturous to the victim," *State v. Brown*, 315 N.C. 40, 65, 337 S.E.2d 808, 826-27 (1985), *cert. denied*, 476 U.S. 1164, 90 L. Ed. 2d 733 (1986), *and overruled on other grounds by State v. Vandiver*, 321 N.C. 570, 364 S.E.2d 373 (1988). The third type includes killings that "demonstrate[] an unusual depravity of mind on the part of the defendant beyond that normally present in first-degree murder[s]." *Id.* at 65, 337 S.E.2d at 827.

*State v. Lloyd*, 354 N.C. 76, 122, 552 S.E.2d 596, 627-28 (2001) (alter-ations in original), *quoted in State v. Anthony*, 354 N.C. at 434-35, 555 S.E.2d at 596. Moreover, a murder is not rendered especial-ly heinous, atrocious, or cruel merely by the specific method in which a victim is killed, but by the entire set of circumstances surrounding the killing. *See, e.g., State v. Golphin*, 352 N.C. at 464, 533 S.E.2d at 233.

The evidence here supported each of the three types of murder that warrant submission of the (e)(9) aggravating circumstance. First, the evidence showed that victims Lambert and Moore endured a prolonged dehumanizing ordeal. When Queen and several other gang members pinned Moore's car at the end of a dead-end road, she jumped out of her car and ran, repeatedly screaming, "Oh my God, oh my God." When she called her mother on her cellular telephone, a gang member wrestled the telephone out of her hand. Another gang member forced Lambert and then Moore into the trunk of Moore's car at gunpoint, and then Douglas, Black, and Tucker drove away in Moore's car. From the trunk, Lambert and Moore cried and begged their abductors not to hurt them. When Moore pleaded that she had a seven-year-old daughter, Douglas told her to "shut up, bitch," and then turned up the radio's volume. At one point, the driver stopped the car so that Black and Douglas could open the trunk and rob the

victims of their jewelry. Upon the group's return to Walters' trailer, the entire gang surrounded Moore's car and discussed who would kill the two women in the trunk. On instructions from Walters, gang members drove the two victims, still locked in the trunk, to a location in Linden, where they were murdered. Based on this evidence, we hold that the ordeal that Lambert and Moore endured prior to their death supported submission of the (e)(9) circumstance.

Second, the two victims were unquestionably "aware of but helpless to prevent impending death." *State v. Lloyd*, 354 N.C. at 122, 552 S.E.2d at 627-28. At Walters' trailer, Lambert and Moore could hardly have failed to hear the gang members discussing who would kill them. Once the gang drove the victims to Linden and forced them out of the trunk, they pleaded for mercy. Lambert stated, "Oh, God, Susan, we're going to die. I don't want to die." Queen told Lambert to shut up and shot her in the head. Queen then walked back to the car and stood next to Tirado, who held a large knife to Moore's throat. When Moore begged Tirado not to cut her and to shoot her instead, he shot her in the back of the head. This evidence, combined with the evidence narrated above, demonstrated that both victims anticipated the moment the gang would end their lives, again supporting submission of the (e)(9) circumstance. *See State v. Mann*, 355 N.C. 294, 313, 560 S.E.2d 776, 788 (when the victim was alive when forced into the trunk of her car and the evidence supported a reasonable inference that she "tried desperately, but futilely, to free herself as she anticipated the moment when defendant would end her life," the trial court committed no error in submitting the (e)(9) aggravating circumstance), *cert. denied*, 537 U.S. 1005, 154 L. Ed. 2d 403 (2002).

Third, the killings of Lambert and Moore "demonstrate an unusual depravity of mind on the part of the defendant." *State v. Lloyd*, 354 N.C. at 122, 552 S.E.2d at 627-28. Evidence showed that immediately after shooting Lambert, Queen stated, "Oh, sh—, I seen that bitch's brains." Queen also stated to law enforcement that the motivation behind his actions was "to show my B.G. [that is, baby gangster, or gang initiate] she ain't up there with me." This evidence of Queen's unusually depraved state of mind supported submission of the (e)(9) circumstance.

We also note that this Court has repeatedly held that the North Carolina Pattern Jury Instructions on the (e)(9) aggravating circumstance provide constitutionally sufficient guidance to the jury. *State v. Syriani*, 333 N.C. at 391-92, 428 S.E.2d at 141. Because the instruc-

STATE v. TIRADO

[358 N.C. 551 (2004)]

tions on the (e)(9) aggravating circumstance here followed the pattern, Queen's arguments to the contrary are without merit.

Viewed in the light most favorable to the State, the evidence supported the trial court's submission of the (e)(9) aggravating circumstance that the murders were especially heinous, atrocious, or cruel. In addition, the instruction as to the circumstance was constitutionally sufficient. This assignment of error is overruled.

[18] Queen next contends that he was denied his federal and state constitutional rights to a fair sentencing hearing and freedom from cruel and unusual punishment when the trial court required him to be present during co-defendant Tirado's sentencing hearing. Queen maintains that his presence prejudiced him by allowing and encouraging the jury to consider the evidence in Tirado's sentencing proceeding at Queen's sentencing proceeding and by permitting the jury to draw improper adverse inferences linking the two defendants' sentences together.

As noted above, constitutional claims not raised and passed on at trial will not be considered on appeal. *State v. Golphin*, 352 N.C. at 411, 533 S.E.2d at 202; *State v. Benson*, 323 N.C. at 322, 372 S.E.2d at 519. To preserve a question for appellate review, a party must have presented the trial court with a timely request, objection, or motion, stating the specific grounds for the ruling if the specific grounds are not apparent from the context. N.C. R. App. P. 10(b)(1). When the logistics of Tirado's and Queen's separate sentencing hearings before the same trial jury were discussed at trial, the following colloquy occurred between the trial judge and Queen's counsel:

> THE COURT: All right, now I want to make it clear that Mr. Queen and counsel certainly will be allowed to be here in the courtroom and to observe the proceedings and to hear and see the evidence that is presented. What is the defendant Queen's position in that regard?
>
> . . . .
>
> [DEFENSE COUNSEL]: —it is the position of the defendant Queen that if counsel are allowed to be present during Mr. Tirado's sentencing—and [the other defense counsel] and I have discussed this matter and it's our intention that either one or both of us will be present during the sentencing hearing—that it is not necessary for Mr. Queen to attend.

I don't know if it's appropriate at this time. And we object to the separate sentencing hearings on grounds that we have heretofore raised with the court and we discussed at some length earlier in the trial, and we're just renewing our objection at this point.

Other than that, assuming that the court is overruling the objection, we think it will be sufficient as long as counsel are present and observe and see what's going on, just in case something does arise that we need to deal with during Mr. Queen's sentencing.

THE COURT: Well, inasmuch as the defendant has a non-waivable right to be present and inasmuch as this is the same jury that has determined his guilt and will determine the sentence recommendation, I am ordering that he be here and that you folks be here.

Queen made no objection to the court's ruling that he attend Tirado's sentencing hearing. Therefore, Queen waived appellate review of this assignment of error.

We further note that the trial judge acted out of an abundance of caution and with the purpose of avoiding any claim of error arising from Queen's absence at Tirado's sentencing proceeding. Queen has failed to demonstrate prejudice arising from the trial court's decision. This assignment of error is overruled.

[19] Queen next contends that the trial court committed reversible constitutional error by submitting as separate aggravating circumstances that the murders were "committed while the defendant was engaged . . . in the commission of . . . kidnapping," N.C.G.S. § 15A-2000(e)(5), that the murders were "committed for pecuniary gain," N.C.G.S. § 15A-2000(e)(6), and that the murders were "part of a course of conduct . . . which included the commission by the defendant of other crimes of violence against another person or persons," N.C.G.S. § 15A-2000(e)(11). Queen argues that these three aggravating circumstances were based on the same evidence and are inherently duplicitous.

Queen did not object, as required by Rule 10(b)(1) of the Rules of Appellate Procedure, to the trial court's submission of any of these three aggravating circumstances, either alone or in combination with one another. *See* N.C. R. App. P. 10(b)(1). Under these circumstances,

we review for plain error. *See State v. Cummings*, 346 N.C. 291, 330, 488 S.E.2d 550, 573 (1997), *cert. denied*, 522 U.S. 1092, 139 L. Ed. 2d 873 (1998).

North Carolina law provides that impermissible "double-counting" of aggravating circumstances occurs "when two aggravating circumstances based upon the same evidence are submitted to the jury." *State v. Call*, 349 N.C. 382, 426, 508 S.E.2d 496, 523 (1998).

> "It is established law in North Carolina that it is error to submit two aggravating circumstances when the evidence to support each is precisely the same. Conversely, where the aggravating circumstances are supported by separate evidence, it is not error to submit both to the jury, even though the evidence supporting each may overlap."

*State v. Davis*, 353 N.C. 1, 42, 539 S.E.2d 243, 270 (2000) (quoting *State v. East*, 345 N.C. 535, 553-54, 481 S.E.2d 652, 664, *cert. denied*, 522 U.S. 918, 139 L. Ed. 2d 236 (1997)) (citations omitted), *cert. denied*, 534 U.S. 839, 151 L. Ed. 2d 55 (2001). In determining whether such evidence is impermissibly identical or merely overlapping, we may consider the aspect of the case or defendant addressed by the aggravating circumstance.

> [I]n some cases the same evidence will support inferences from which the jury might find that more than one of the enumerated aggravating circumstances is present. This duality will normally occur where the defendant's motive is being examined rather than where the state relies upon a specific factual element of aggravation.

*State v. Goodman*, 298 N.C. 1, 30, 257 S.E.2d 569, 588 (1979).

The (e)(5) circumstance, carrying out the murder while in commission of a kidnapping, "directs the jury's attention to the factual circumstances of defendant's crimes," and thus addresses the defendant's conduct. *State v. Green*, 321 N.C. 594, 610, 365 S.E.2d 587, 597, *cert. denied*, 488 U.S. 900, 102 L. Ed. 2d 235 (1988). In contrast, the (e)(6) circumstance, committing the murder for pecuniary gain, "requires the jury to consider not defendant's actions but his motive" for killing the victims. *Id.* Here, the evidence at trial showed that after Cheeseborough's car was stolen and she was shot, Walters ordered several members of the gang to find an additional vehicle because all of the members could not fit into Cheeseborough's car.

The gang then stole at gunpoint Moore's 1989 Pontiac Grand Prix and forced the two women into the trunk. On the way back to Walters' trailer, the gang stopped the car and robbed Lambert and Moore of their cash and jewelry. After the two women were eventually murdered, members of the gang drove the stolen car to Myrtle Beach, where some of the stolen jewelry was pawned. Hence, evidence that the murders were committed in the course of kidnapping, which was accomplished while highjacking Moore's car, supported submission of the (e)(5) circumstance. The subsequent robbery of Lambert and Moore's jewelry and money supported submission of the (e)(6) circumstance. *See State v. Miller*, 357 N.C. 583, 595, 588 S.E.2d 857, 866 (2003).

Queen also contends that impermissible double-counting could have occurred if the jury used evidence of one of the robberies to support the (e)(11) aggravating circumstance (course of conduct). However, this Court has previously held that it is proper for a sentencing jury in a double homicide case to find each murder to be a course of violent conduct aggravating the other murder. *See, e.g., State v. Nicholson*, 355 N.C. 1, 49, 558 S.E.2d 109, 142, *cert. denied*, 537 U.S. 845, 154 L. Ed. 2d 71 (2002); *State v. Boyd*, 343 N.C. 699, 719-20, 473 S.E.2d 327, 338 (1996), *cert. denied*, 519 U.S. 1096, 136 L. Ed. 2d 722 (1997). In this case, each murder provided the basis for the (e)(11) circumstance as to the other murder.

This analysis demonstrates that the evidence of the stealing of Moore's car, the theft of the victims' jewelry, and the double homicide independently supported different aggravating circumstances without impermissible double-counting. Although defendant argues that the trial court's instructions allowed double-counting by failing to direct the jury as to which evidence supported each aggravating circumstance, we have never required such specificity. *See State v. Prevatte*, 356 N.C. 178, 570 S.E.2d 440 (2002), *cert. denied*, 538 U.S. 986, 155 L. Ed. 2d 681 (2003). Even so, the record demonstrates that the trial court "did not allow the jury to find . . . [all three] aggravating circumstances using the exact same evidence." *State v. Call*, 349 N.C. at 427, 508 S.E.2d at 524. After instructing the jury on each submitted aggravating circumstance, the trial court specifically instructed that "the same evidence cannot be used as a basis for more than one aggravating factor or circumstance." *See State v. Leeper*, 356 N.C. 55, 63, 565 S.E.2d 1, 6 (2002) (trial court did not err when trial judge instructed jurors not to use same evidence as basis for finding more than one aggravating circumstance). Accordingly, we conclude

both that the (e)(5), (e)(6), and (e)(11) aggravating circumstances were not subsumed within each other, and that the trial court did not commit error by instructing the jury on all three circumstances.

These assignments of error are overruled.

## PRESERVATION ISSUES

Queen raises several additional issues that he concedes previously have been decided by this Court contrary to his position. He argues that the murder indictment was constitutionally insufficient because it failed to allege the aggravating circumstances applicable at the capital sentencing proceeding. However, we have held that the failure to include all aggravating circumstances in an indictment "violates neither the North Carolina nor the United States Constitution." *State v. Hunt*, 357 N.C. 257, 278, 582 S.E.2d 593, 607, *cert. denied*, —— U.S. ——, 156 L. Ed. 2d 702 (2003). Queen next contends that the trial court erred when it instructed the jury that their answers to Issues One, Three, and Four must be unanimous for capital sentencing. We have previously held that because any jury recommendation requiring a sentence of death or life imprisonment must be unanimous pursuant to Article I, Section 24 of the North Carolina Constitution and N.C.G.S. § 15A-2000(b), Issues One, Three, and Four must be answered unanimously by the jury. *See State v. McCarver*, 341 N.C. 364, 388-94, 462 S.E.2d 25, 38-42 (1995), *cert. denied*, 517 U.S. 1110, 134 L. Ed. 2d 482 (1996). Queen maintains that the trial court erroneously instructed the jury that it had a "duty" to return a death sentence if it made certain findings. We have previously approved such instructions. *See, e.g., State v. Williams*, 355 N.C. 501, 588, 565 S.E.2d 609, 659 (2002), *cert. denied*, 537 U.S. 1125, 154 L. Ed. 2d 808 (2003). Queen also maintains that the trial court's instructions as to his burden of proof to establish mitigating circumstances was unconstitutionally vague as a result of the use of the term "satisfies you." We have previously approved similar instructions. *See State v. Anthony*, 354 N.C. at 451, 555 S.E.2d at 606.

Queen contends that the trial court erred in instructing the sentencing jury that it could reject nonstatutory mitigating circumstances on the grounds that the circumstances had no mitigating value. We have held that such instructions do not permit the jury to refuse to consider relevant mitigating evidence and are constitutional. *See, e.g., State v. Hill*, 331 N.C. 387, 417-18, 417 S.E.2d 765, 780 (1992), *cert. denied*, 507 U.S. 924, 122 L. Ed. 2d 684 (1993). Queen further contends that the trial court's sentencing instruction as to the

definition of "aggravation" was unconstitutionally broad. We have held that North Carolina's capital sentencing scheme contained in N.C.G.S. § 15A-2000 is constitutional on its face and as applied, and thus have approved of such instructions. *See State v. Barfield*, 298 N.C. 306, 343-54, 259 S.E.2d 510, 537-44 (1979), *cert. denied*, 448 U.S. 907, 65 L. Ed. 2d 1137 (1980), *overruled in part on other grounds by State v. Johnson*, 317 N.C. 193, 344 S.E.2d 775 (1986). Queen argues that the trial court erred by instructing the jury that in considering Issues Three and Four, the jurors "may" rather than "must" consider mitigating circumstances found in Issue Two of the "Issues and Recommendation as to Punishment" form. We have approved the use of the pattern jury instructions in this regard and have upheld similar language as being consistent with the requirements of the statute. *See State v. Gregory*, 340 N.C. 365, 417-19, 459 S.E.2d 638, 668-69 (1995), *cert. denied*, 517 U.S. 1108, 134 L. Ed. 2d 478 (1996). Queen additionally contends that the trial court erred by instructing the jury that for Issues Three and Four, each juror could only consider mitigating circumstances which that particular juror had found for Issue Two. We have previously approved of similar instructions to the jury. *See State v. Skipper*, 337 N.C. 1, 50-51, 446 S.E.2d 252, 280 (1994), *cert. denied*, 513 U.S. 1134, 130 L. Ed. 2d 895 (1995).

Queen raises these issues for the purposes of urging this Court to reexamine its prior holdings and preserving the issues for federal *habeas corpus* review. We have considered Queen's arguments on these additional issues and find no compelling reason to depart from our prior holdings.

These assignments of error are overruled.

## PROPORTIONALITY ISSUES

[20] Having concluded that Queen's trial and sentencing proceeding were free from prejudicial error, we now determine: (1) whether the record supports the aggravating circumstances found by the jury and upon which the sentence of death was based; (2) whether the death sentence was imposed under the influence of passion, prejudice, or any other arbitrary factor; and (3) whether the death sentence "is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant." N.C.G.S. § 15A-2000(d)(2). The jury found four aggravating circumstances: that defendant committed the murders while engaged in the commission of first-degree kidnapping, N.C.G.S. § 15A-2000(e)(5); that

he committed the murders for pecuniary gain, N.C.G.S. § 15A-2000(e)(6); that the murders were especially heinous, atrocious, or cruel, N.C.G.S. § 15A-2000(e)(9); and that the murders were part of a course of conduct in which Queen engaged and which included the commission by Queen of other crimes of violence against other persons, N.C.G.S. § 15A-2000(e)(11). After reviewing the record, transcripts, briefs, and oral arguments, we conclude that the evidence supports all four aggravating circumstances. In addition, we conclude that the death sentence was not imposed under the influence of passion, prejudice, or any other arbitrary factor.

Proportionality review requires that we determine whether the sentence of death is "excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant." *State v. Williams*, 308 N.C. 47, 79, 301 S.E.2d 335, 355, *cert. denied*, 464 U.S. 865, 78 L. Ed. 2d 177 (1983); *see also* N.C.G.S. § 15A-2000(d)(2). In undertaking this review, which ultimately rests "upon the 'experienced judgments' of the members of this Court," *State v. Green*, 336 N.C. 142, 198, 443 S.E.2d 14, 47, *cert. denied*, 513 U.S. 1046, 130 L. Ed. 2d 547 (1994), we "must compare the present case with other cases in which this Court has ruled upon the proportionality issue." *State v. McCollum*, 334 N.C. 208, 240, 433 S.E.2d 144, 162 (1993), *cert. denied*, 512 U.S. 1254, 129 L. Ed. 2d 895 (1994).

This Court has found that the death sentence was disproportionate in eight cases. *State v. Kemmerlin*, 356 N.C. 446, 573 S.E.2d 870 (2002); *State v. Benson*, 323 N.C. 318, 372 S.E.2d 517 (1988); *State v. Stokes*, 319 N.C. 1, 352 S.E.2d 653 (1987); *State v. Rogers*, 316 N.C. 203, 341 S.E.2d 713 (1986), *overruled on other grounds by State v. Gaines*, 345 N.C. 647, 483 S.E.2d 396, *cert. denied*, 522 U.S. 900, 139 L. Ed. 2d 177 (1997), *and by State v. Vandiver*, 321 N.C. 570, 364 S.E.2d 373 (1988); *State v. Young*, 312 N.C. 669, 325 S.E.2d 181 (1985); *State v. Hill*, 311 N.C. 465, 319 S.E.2d 163 (1984); *State v. Bondurant*, 309 N.C. 674, 309 S.E.2d 170 (1983); *State v. Jackson*, 309 N.C. 26, 305 S.E.2d 703 (1983). We conclude that the case at bar is not substantially similar to any of these cases. *See State v. Walters*, 357 N.C. 68, 113, 588 S.E.2d 344, 371, *cert. denied*, —— U.S. ——, 157 L. Ed. 2d 320 (2003).

The jury found Queen guilty of first-degree murder on the basis of premeditation and deliberation and under the felony murder rule. We have recognized that "a finding of premeditation and deliberation

indicates 'a more calculated and cold-blooded crime.' " *State v. Harris*, 338 N.C. 129, 161, 449 S.E.2d 371, 387 (1994) (quoting *State v. Lee*, 335 N.C. 244, 297, 439 S.E.2d 547, 575, *cert. denied*, 513 U.S. 891, 130 L. Ed. 2d 162 (1994)), *cert. denied*, 514 U.S. 1100, 131 L. Ed. 2d 752 (1995). This case involved two murder victims, and our review reveals that no death sentence involving multiple homicides has been determined to be disproportionate. *See State v. Brown*, 357 N.C. 382, 394, 584 S.E.2d 278, 285 (2003), (citing *State v. Gregory*, 348 N.C. 203, 213, 499 S.E.2d 753, 760, *cert. denied*, 525 U.S. 952, 142 L. Ed. 2d 952 (1998)), *cert. denied*, —— U.S. ——, 158 L. Ed. 2d 106 (2004). In addition, this Court has never found a sentence of death to be disproportionate where more than two aggravating circumstances were found, and we recently found a death sentence proportionate where the jury found the same four aggravating circumstances that were found here. *State v. Call*, 353 N.C. 400, 545 S.E.2d 190, *cert. denied*, 534 U.S. 1046, 151 L. Ed. 2d 548 (2001). Based upon the facts of the case at bar and the treatment of other similar cases, we are satisfied that the death penalty recommended by the jury and ordered by the trial court is not disproportionate. Queen received a fair trial and capital sentencing proceeding, free from prejudicial error.

TIRADO: NO ERROR GUILT-INNOCENCE PHASE; DEATH SENTENCE VACATED; REMANDED FOR NEW CAPITAL SENTENCING PROCEEDING.

QUEEN: NO ERROR.

Justice BRADY did not participate in the consideration or decision of this case.