IN THE SUPREME COURT OF NORTH CAROLINA

No. 264A21

Filed 15 December 2023

STATE OF NORTH CAROLINA

v.

ISAIAH SCOTT BECK

Appeal pursuant to N.C.G.S. § 7A-30(2) from the decision of a divided panel of the Court of Appeals, 278 N.C. App. 255 (2021), vacating in part and finding no error in part in a judgment entered on 31 October 2019 by Judge Susan E. Bray, in Superior Court, Watauga County. On 14 December 2021, the Supreme Court allowed defendant's petition for discretionary review of an additional issue. Heard in the Supreme Court on 13 September 2023.

*Joshua H. Stein, Attorney General, by Robert C. Ennis, Assistant Attorney General, for the State-appellant/appellee.*

*Glenn Gerding, Appellate Defender, by Sterling Rozear, Assistant Appellate Defender, for defendant-appellant/appellee.*

BARRINGER, Justice.

Here, we consider whether the Court of Appeals erred by vacating defendant's conviction for conspiracy to commit robbery with a dangerous weapon. Upon careful review, we hold that the trial court did not err. Therefore, we reverse the Court of Appeals and direct the Court of Appeals to reinstate defendant's conviction for conspiracy to commit robbery with a dangerous weapon.

## I. Factual Background

In April of 2017, Daniel Silva, Javier Holloway, and defendant Isaiah Scott Beck lived in Lexington, North Carolina. The three also knew Cameron Baker who, at that time, lived in Boone, North Carolina. Baker knew Mackenzie Beshears, a drug dealer selling marijuana and Xanax in Boone.

At defendant's trial, the evidence tended to show as follows. Defendant, Silva, and Holloway made plans to rob a drug dealer in Boone. Initially, the three did not have a plan as to whom, specifically, they would rob. On 18 April 2017, Silva texted Holloway, "Send me a pic with me and the gun [ ] so I can show my [a]migo." Later that day, Holloway texted Silva, "[hit me up as soon as possible] got a lick," referring to a robbery. On 24 April 2017, Holloway texted Silva saying, "Aye bro I need that AR asap." On 26 April 2017, Holloway texted Silva asking whether he was "try[ing to get in] on this lick in the [a.m.]." When Silva texted back asking, "Where?", Holloway replied, "Boone, certified we gone come up bro we just need a ride." Silva responded to Holloway, "I got you" and "Be ready at 9." Silva clarified by asking, "me you and [defendant]?", to which Holloway replied, "Yeah."

While defendant, Silva, and Holloway were en route to Boone on 27 April 2017, defendant contacted Baker and asked him if he knew where defendant "could buy some drugs and stuff." Baker then coordinated a meeting between Beshears and defendant, Holloway, and Silva, to take place that day. Defendant then informed Baker he was going to "take all the money [Beshears] got too . . . ."

At trial, Beshears testified that Baker had contacted her on 27 April 2017, asking if she had any marijuana or Xanax for sale. Baker told Beshears that he and a friend would be coming over to purchase the drugs. Baker later told Beshears that only his friend Silva would meet her instead. On the afternoon of 27 April 2017, Beshears and her boyfriend, Devon Trivette, saw Silva pull into the empty parking lot at her apartment. Beshears spoke with Silva on the phone, identifying which apartment was hers. Then Silva drove away unexpectedly. Beshears texted Silva, who replied that he had become "sketched . . . out [when he saw] somebody peaking [sic] round the corner . . . ." Silva explained that he understood from Baker that Beshears was going to come to the parking lot to transact the sale. Beshears replied "I'll come down if ya want!" Roughly twenty-four minutes later, Silva returned to Beshears' apartment complex, parked his vehicle, and went inside Beshears' apartment.

Upon entering Beshears' apartment, Silva sat down on her couch. Then defendant and Holloway, wearing all black clothing and face coverings, broke in the door of the apartment. Defendant pointed the barrel of an AR-15 at Beshears' head while instructing Holloway to "grab everything." A struggle ensued. Beshears and Trivette were able to push defendant and Holloway out of the apartment, while their roommate called police. Silva helped hold the door closed as Beshears and Trivette pushed defendant and Holloway outside. Beshears testified that during the struggle, Silva stated that he did not know the break-in was going to happen.

## II.     Procedural Background

Defendant was indicted on four charges: conspiracy to commit robbery with a dangerous weapon, robbery with a dangerous weapon, conspiracy to commit felonious breaking or entering, and felonious breaking or entering. At the close of the State's evidence, defendant moved to dismiss all charges. Pertinent to this appeal, defendant contended that the State failed to present sufficient evidence of multiple conspiracies. The trial court denied defendant's motions to dismiss. A jury found defendant guilty of all four charges.

On appeal, the Court of Appeals held that the trial court erred by denying defendant's motion to dismiss one of the two conspiracy charges, and vacated defendant's conviction for conspiracy to commit robbery with a dangerous weapon. *State v. Beck*, 278 N.C. App. 255, 261–62 (2021).[1] The Court of Appeals reasoned that the State's evidence established one single conspiracy that continued from on or around 18 April 2017 through the date of the breaking or entering and armed robbery on 27 April 2017. *Id.* Judge Tyson issued an opinion, dissenting in part, in which he opined that the State presented sufficient evidence to deny defendant's motion to dismiss the charge of conspiracy to commit robbery with a dangerous weapon. *Id.* at

---

[1] We also note that the Court of Appeals erred in determining the charge of conspiracy to commit breaking or entering would be the conspiracy charge to remain if there had been sufficient evidence of only one conspiracy. During oral argument, defendant conceded that the conspiracy to commit robbery with a dangerous weapon would be the conspiracy charge to remain, if only one conspiracy charge would stand. *See* Oral Argument at 53:34, *State v. Beck* (No. 264A21) (Sept. 13, 2023).

264–65. The State appealed that issue to this Court, in accordance with N.C.G.S. § 7A-30(2). Defendant also filed a petition for discretionary review of an additional issue pursuant to N.C.G.S. § 7A-31, which this Court allowed.[2]

## III.    Standard of Review

Whether the State presented substantial evidence of conspiracy to commit robbery with a dangerous weapon is a question of law. Therefore, we review the denial of defendant's motion to dismiss de novo. *E.g., State v. Golder*, 374 N.C. 238, 250 (2020). Substantial evidence is the "amount . . . necessary to persuade a rational juror to accept a conclusion." *Id.* at 249 (quoting *State v. Winkler*, 368 N.C. 572, 574 (2015)). Substantial evidence means "more than a scintilla of evidence." *State v. Powell*, 299 N.C. 95, 99 (1980). In our review of the sufficiency of evidence, we consider the evidence in the light most favorable to the State. *E.g., Golder*, 374 N.C. at 250. The State is entitled to "every reasonable intendment and every reasonable inference to be drawn" from the evidence presented. *Id.* (cleaned up). If the record reveals that substantial evidence of the charged offenses has been presented, "the case is for the jury and the motion to dismiss should be denied." *Id.* (cleaned up).

## IV.    Analysis

The crime of conspiracy is committed when two or more persons agree to perform an unlawful act. *State v. Cox*, 375 N.C. 165, 169 (2020). A single conspiracy

---

[2] The issue presented in the petition for discretionary review was whether the Court of Appeals erred when it failed to remand for resentencing after vacating one of two convictions that had been consolidated for judgment.

can encompass multiple crimes. *See State v. McLamb*, 313 N.C. 572, 578 (1985).

However, in the course of completing the target crime of an original conspiracy, a defendant may enter into an additional and separate conspiracy to commit a different crime not conspired to originally. *State v. Gibbs*, 335 N.C. 1, 48–49 (1993) (defendant first conspired to commit murder with two co-conspirators, then formed a second conspiracy when, in the course of committing the murders, he and one of the original co-conspirators formed a separate agreement to commit burglary in order to accomplish the murders), *cert. denied*, 512 U.S. 1246 (1994). "[W]hether multiple agreements constitute a single conspiracy or multiple conspiracies is a question of fact for the jury." *State v. Tirado*, 358 N.C. 551, 577 (2004), *cert. denied*, 544 U.S. 909 (2005) (identifying a non-exhaustive list of factors that *may be considered* by the *Tirado* jury). Evidence of an express agreement is not required. *State v. Winkler*, 368 N.C. 572, 575 (2015). Rather, "evidence tending to show a mutual, implied understanding will suffice." *Id.* (quoting *State v. Morgan*, 329 N.C. 654, 658 (1991)).

The issue before us is whether the State presented substantial evidence of multiple conspiracies, or just one conspiracy. As related to the conspiracies, the State had the burden of presenting substantial evidence tending to show that defendant and at least one other person formed the original conspiracy by agreeing to commit robbery with a dangerous weapon. The State also had the burden of presenting substantial evidence tending to show that defendant and at least one other person formed an additional and separate conspiracy by agreeing to commit the crime of

felonious breaking or entering. *See Cox*, 375 N.C. at 169. The elements of robbery with a dangerous weapon are: (1) the unlawful taking or attempt to take personal property from another; (2) having in possession or with the use or threatened use of any firearms or other dangerous weapon; (3) whereby the life of a person is endangered or threatened. *Id.*; N.C.G.S. § 14-87(a) (2021). The elements of felony breaking or entering are: (1) the breaking or entering; (2) of any building; (3) with the intent to commit any felony or larceny therein. *Cox*, 375 N.C. at 172; N.C.G.S. § 14-54 (2021).

Here, the State presented evidence that on 18 April 2017, Silva texted Holloway asking for "a pic with [Silva] and the gun [ ] so [he] can show [his] [a]migo." Holloway then texted Silva later that same day, "[hit me up as soon as possible] got a lick," referring to a robbery. On 24 April 2017, Holloway texted Silva, saying, "Aye bro I need that AR asap." On 26 April 2017, Holloway texted Silva asking whether he was "try[ing to get in] on this lick in the [a.m.]?" When Silva texted back asking, "Where?", Holloway replied, "Boone, certified we gone come up bro we just need a ride." Silva texted Holloway, "I got you" and "Be ready at 9." Silva clarified by asking "me you and [defendant]?" to which Holloway replied "Yeah." While en route to Boone, defendant contacted Baker and asked where he "could buy some drugs and stuff." Baker then coordinated a meeting between Beshears and Silva to take place on 27 April 2017.

When viewed in the light most favorable to the State, the State presented more

than a scintilla of evidence from which a rational juror could conclude that defendant conspired with Silva and Holloway to commit robbery with a dangerous weapon against Beshears. Further, that juror could reasonably conclude that the original crime of conspiracy—to commit robbery with a dangerous weapon—was complete no later than the morning of 27 April 2017.

Importantly, no evidence was produced that the *original* plan included breaking or entering the apartment. Instead, the evidence presented indicates that defendant, Silva, and Holloway *originally* wanted to rob Beshears somewhere other than inside her apartment. Baker testified that "they weren't trying to necessarily go to [Beshears'] house to get the [drugs] . . . . They wanted to meet somewhere else." Silva went to Beshears' apartment complex, thinking they would meet in the parking lot.

Upon arrival at the apartment complex, Silva became "sketched . . . out" and drove away. Silva then texted Beshears, communicating that he understood that Beshears was going to leave her apartment and come to the parking lot. Beshears replied, offering to come to the parking lot. Roughly twenty-four minutes later, Silva texted Beshears that he was returning to the apartment complex. No evidence was presented regarding what communication may or may not have transpired amongst defendant, Silva, and Holloway in those twenty-four minutes. Silva then went inside Beshears' apartment and sat down. Shortly thereafter, defendant and Holloway, wearing all black clothing and face coverings, broke in the door of Beshears'

apartment. Beshears testified that during the ensuing struggle, Silva stated that he did not know the break-in was going to happen. Silva helped hold the front door closed as Beshears and Trivette pushed defendant and Holloway outside. This testimony creates a question of fact for jury consideration.

When viewed in the light most favorable to the State, a rational juror could conclude that the original plan was to rob Beshears in the parking lot. When viewed in the light most favorable to the State, a rational juror could also conclude that, in those twenty-four minutes between Silva's first and second appearances at the apartment complex, defendant and at least one other person formed an additional and separate conspiracy—a new plan. *Gibbs*, 335 N.C. at 48 ("[T]he defendant committed the offense of conspiracy to commit murder when he, Doris, and Yvette agreed to kill Ann's family. . . . [O]n the night of the murder, a separate agreement was made between the defendant and Yvette . . . to commit first-degree burglary."); *Tirado*, 358 N.C. at 578 ("a rational juror, considering [facts specific to *Tirado,* could find] the evidence established multiple separate conspiracies, rather than one single conspiracy") In the new plan, Silva would enter Beshears' apartment for the meeting, and defendant and Holloway would feloniously break into the apartment.

## V. Conclusion

A rational juror could find, based on the State's evidence presented at trial, that defendant entered into multiple conspiracies—namely, conspiracy to commit robbery with a dangerous weapon and conspiracy to commit felonious breaking or

entering. Accordingly, we conclude that, when the evidence is viewed in the light most favorable to the State, sufficient evidence supports the trial court's decision to deny defendant's motion to dismiss the charges against him, including the charge of conspiracy to commit robbery with a dangerous weapon. Thus, we hold that the trial court did not err in denying defendant's motion to dismiss that charge. Therefore, we reverse the Court of Appeals and direct the Court of Appeals to reinstate the defendant's conviction for conspiracy to commit robbery with a dangerous weapon.

Because we reverse the decision of the Court of Appeals as to the issue on direct appeal and have thus ordered reinstatement of the trial court's judgment upon defendant's conviction for conspiracy to commit robbery with a dangerous weapon, we do not reach the sentencing issue on which defendant seeks discretionary review. Therefore, we conclude that the petition for discretionary review as to an additional issue was improvidently allowed.

REVERSED; DISCRETIONARY REVIEW IMPROVIDENTLY ALLOWED.

Justice RIGGS  dissenting.

The majority reverses the Court of Appeals because, in its view, the State submitted sufficient evidence to permit a rational juror to find the existence of two separate conspiracies.  Its rationale rests largely on the fact that the evidence did not show the conspiracy to rob Ms. Beshears originally included an agreement to break and enter into her apartment.  But our precedents are clear that a multifactor analysis applies to the factual question of whether multiple conspiracies existed: "The nature of the agreement or agreements, the objectives of the conspiracies, the time interval between them, the number of participants, and the number of meetings are all factors that may be considered."  *State v. Tirado*, 358 N.C. 551, 577 (2004).  So, too, is the time at which the purported separate conspiracies were complete.  *Id.* at 577–78.  Because I believe a full consideration of these several factors shows that the agreement to break and enter was part and parcel of the conspiracy to rob Ms. Beshears, I would affirm the Court of Appeals' vacatur of the conspiracy to commit felonious breaking or entering.  And, because I believe that improper conviction may have led the trial court to impose a harsher consolidated sentence than if only one conspiracy conviction was returned, I would also remand for resentencing based on a single conspiracy to commit robbery with a dangerous weapon.

## I.   Single or Multiple Conspiracies as a Constitutional Concern

I do not disagree with the majority's recitation of the applicable scope of review

on appeal and the evidentiary burden placed on the State in attempting to send multiple conspiracy counts to the jury. I do, however, think it appropriate to reiterate the evidentiary standard's constitutional underpinnings. That this evidentiary standard—and any test adopted by this Court to distinguish between single and multiple conspiracies—seeks to protect the constitutional right against double jeopardy cannot be overlooked.

The Fifth Amendment's Double Jeopardy Clause establishes that "[n]o person shall be subject for the same offence to be twice put in jeopardy of life or limb." U.S. Const. amend. V. Similarly, "[t]he Law of the Land Clause incorporates similar protections under the North Carolina Constitution," *State v. Oliver*, 343 N.C. 202, 205 (1996) (citing N.C. Const. art. I, § 19), and "[d]ouble jeopardy has long been a fundamental prohibition of our common law and is deeply imbedded in our jurisprudence," *State v. Hill*, 287 N.C. 207, 214 (1975) (citations omitted). This constitutional protection bears directly on the ability of the State to bring multiple conspiracy charges in connection with related activities,[1] as "[t]he double jeopardy clause clearly prohibits the division of a single criminal conspiracy into multiple violations of a conspiracy statute." *United States v. MacDougall*, 790 F.2d 1135, 1144 (4th Cir. 1986) (citations omitted) (citing *Braverman v. United States*, 317 U.S. 49, 52–53 (1942)).

---

[1] As the majority recognizes, the law is clear that plans to commit multiple different crimes may nonetheless constitute a single conspiracy. *E.g., State v. McLamb*, 313 N.C. 572, 578–79 (1985).

Courts have struggled with how to cleanly and clearly distinguish between single and multiple conspiracies in vindication of this constitutional right. *See, e.g., State v. Rozier*, 69 N.C. App. 38, 52 (1984) ("Defining the scope of a conspiracy or conspiracies remains a thorny problem for the courts."). Most have recognized that a consideration of the full factual circumstances surrounding the criminal enterprise is the appropriate course. *See, e.g., United States v. Leavis*, 853 F.2d 215, 218 (4th Cir. 1988) ("Whether there is a single conspiracy or multiple conspiracies depends upon the overlap of key actors, methods, and goals." (citations omitted)). Our Court of Appeals—which, by simple dint of volume, has had more occasion than this Court to consider the issue—has recognized the same. *See, e.g., Rozier*, 69 N.C. App. at 52 ("There is no simple test for determining whether single or multiple conspiracies are involved: . . . factors such as time intervals, participants, objectives, and number of meetings all must be considered."). Central to the evaluation of these factors is "the nature of the agreement." *Id.* (citing *Braverman*, 317 U.S. 49).

## II.    The *Tirado* Factors Applied

Recognizing the wisdom of our Court of Appeals' decisions in cases involving multiple conspiracies, this Court explicitly adopted a multifactor analysis in *Tirado*. 358 N.C. at 577. Our holding in that case tasks us with considering, *inter alia*, "[t]he nature of the agreement or agreements, the objectives of the conspiracies, the time interval between them, the number of participants, and the number of meetings." *Id.* (citing *State v. Dalton*, 122 N.C. App. 666, 672–73 (1996)). Also relevant is the timing

of when each purportedly separate conspiracy ended. *Id.* at 577–78.

Viewing the evidence in the light most favorable to the State, I believe the nature and objectives of the agreements in this case weigh against multiple conspiracies. There is no evidence suggesting, for example, that breaking and entering into Ms. Besehears' apartment was considered an end in and of itself; in other words, the breaking and entering was not agreed to and accomplished for its own sake. Nor does the breaking and entering appear to have been undertaken for any purpose *other than* to rob Ms. Beshears. To the contrary, all the evidence demonstrates that Mr. Silva, Mr. Holloway, and Mr. Beck agreed to break and enter for the single and sole purpose of stealing from Ms. Beshears; no other motivation is suggested by the evidence. The nature and object of the agreements are thus functionally indistinguishable and militate against submitting separate conspiracy counts to the jury.

The time interval, number of participants, and number of meetings likewise weigh against multiple conspiracies, even considered in the light most favorable to the State. As the majority notes, the State's evidence shows the agreement to rob Ms. Beshears was complete amongst Mr. Silva, Mr. Holloway, and Mr. Beck on the morning of 27 April 2017.[2] That afternoon, and a mere twenty-four minutes after the

---

[2] Assuming the text messages between Mr. Silva and Mr. Holloway suggest some prior agreement by Mr. Beck to participate in a robbery of Ms. Beshears, the first mention of his involvement occurred on the night of 26 April 2017. I do not find this difference of less than twenty-four hours to be significant.

original plan was frustrated by Ms. Beshears' absence, Mr. Silva, Mr. Holloway, and Mr. Beck agreed to break and enter into her apartment to accomplish the previously planned robbery. A few hours difference in plans amongst the same three participants, spread between a few text messages and a single physical meeting, does not suggest the existence of multiple conspiracies.

That both conspiracies terminated at the same time also suggests the existence of a single conspiracy. While it is true that the *offense* of conspiracy is complete "[a]s soon as the union of wills for the unlawful purpose is perfected," *State v. Knotts*, 168 N.C. 173, 188 (1914), the crime itself "ends with the attainment of its criminal objectives," *Tirado*, 358 N.C. at 577 (cleaned up). I therefore believe the majority's narrow focus and emphasis on which crimes were contemplated when the offense of conspiracy to commit armed robbery was completed misses the mark, as the evidence shows the conspiracy was still continuing when the plan to break and enter was formed. Indeed, to hold otherwise renders that consideration dispositive—a result plainly not contemplated, let alone suggested, by the multifactor test enunciated in *Tirado*.[3]

In sum, the evidence in the light most favorable to the State shows three men conspired to rob Ms. Beshears. Less than twenty-four hours later, and before the

---

[3] The majority suggests that a full consideration of all relevant factors is not required by *Tirado*. I do not believe that is consistent with the analysis actually conducted in that case, which reached its ultimate decision only after "considering the series of meetings, the variety of locations and participants, their different objectives, and the statements of conspirators." *Id.* at 578.

robbery was accomplished, those same three men agreed to breaking and entering in order to accomplish the planned robbery.[4] Consideration of these facts consistent with the multifactor test in *Tirado* leads me to conclude that the evidence establishes the existence of a single overarching conspiracy, consisting of multiple planned crimes, to rob Ms. Beshears. Because our caselaw recognizes only a single chargeable offense arises in these circumstances, *McLamb*, 313 N.C. at 578—79, and with concern for constitutional double jeopardy protections, I respectfully disagree with the majority's holding that the trial court properly submitted two separate conspiracy counts to the jury.

### III.    Resentencing

My resolution of the above issues necessarily leads me to dissent from the majority's decision to dismiss Mr. Beck's petition for discretionary review as improvidently allowed. Turning to the arguments raised in that petition on the merits, I would hold that the Court of Appeals erred in declining to remand this matter for resentencing after vacating one of the conspiracies consolidated at Mr. Beck's initial sentencing.

In *State v. Wortham*, this Court identified the influence of multiple convictions in consolidated discretionary sentencing, and concluded that remand for resentencing is appropriate when at least one of the consolidated convictions was in error:

> Since it is probable that a defendant's conviction for

---

[4] Mr. Baker, for his part, set up both the initial robbery and Mr. Silva's return to the apartment complex after the initial buy fell through.

> two or more offenses influences adversely to him the trial court's judgment on the length of the sentence to be imposed when these offenses are consolidated for judgment, we think the better procedure is to remand for resentencing when one or more but not all of the convictions consolidated for judgment has been vacated.

318 N.C. 669, 674 (1987). While *Wortham* was decided in the context of the discretion afforded to judges under the repealed Fair Sentencing Act rather than under the now-controlling Structured Sentencing Act, trial court judges nonetheless retain discretion under current law to sentence a defendant "within the range specified for the class of offense and prior record level." N.C.G.S. § 15A-1340.13(b) (2023). *See also State v. Parker*, 143 N.C. App. 680, 685–86 (2001) ("The Structured Sentencing Act clearly provides for judicial discretion in allowing the trial court to choose a minimum sentence within a specified range."). I would thus continue to apply the practice adopted in *Wortham* and remand for resentencing.[5] *See, e.g., State v. Dew*, 379 N.C. 64, 74–75 (2021) (remanding for resentencing when one of the convictions incorporated in the consolidated sentence was in error).

## IV. Conclusion

The majority's analysis omits substantive engagement with *Tirado*'s recitation of a multifactor test for determining whether the State has introduced sufficient evidence of multiple conspiracies. The majority's elision of that precedent flattens the relevant analysis to a single question—namely, whether commission of the later

---

[5] Notably, Mr. Beck received the maximum sentence allowed within the presumptive range for each offense.

agreed-upon crime was originally envisioned when the conspiracy was first formed. My reading of *Tirado*—and my concern for the double jeopardy protection undergirding the rule against improper prosecution for multiple conspiracies—would lead me to affirm the vacatur of Mr. Beck's conviction for conspiracy to commit breaking and entering. I also would remand for resentencing on the remaining conspiracy conviction. I respectfully dissent.

Justice EARLS joins in this dissenting opinion.